1   UNITED STATES DISTRICT COURT
2   DISTRICT OF PUERTO RICO

3   UNITED STATES OF AMERICA,

4       Plaintiff,                           Criminal No. 12-221 (JAF)

5       v.

6   XAVIER JIMÉNEZ-BENCEVÍ,

7       Defendant.

8

9   **MEMORANDUM OPINION**

10       We must decide whether Xavier Jiménez-Benceví, a defendant facing capital charges,

11   qualifies as mentally retarded[1] and, therefore, may not be sentenced to death.  See Atkins v.

12   Virginia, 536 U.S. 304 (2002) (holding that the execution of mentally retarded persons

13   constitutes cruel and unusual punishment in violation of the Eighth Amendment).  After having

14   considered the testimony and evidence presented, we conclude that Jiménez-Benceví is not

15   mentally retarded and is therefore eligible to be tried as a capital offender.

16   **I.**

17
18   **FACTUAL AND PROCEDURAL HISTORY**

19
20   **A.**   **Procedural History**

21       Jiménez-Benceví was indicted on one count of murdering a federal witness in violation

22   of 18 U.S.C. § 1512(a)(1)(C).  (Indictment, Docket No. 11.)  The indictment alleges that

23   Jiménez-Benceví shot and killed Delia Sánchez-Sánchez in a grocery store parking lot after he

24   had learned of her intent to speak to federal authorities about his involvement in a multi-city

---

[1] We use the term "mental retardation" throughout because that is the phrase employed by the relevant legal authorities, including the Supreme Court.  We recognize, however, that many clinical associations now advocate the use of the term "intellectual disability" instead of "mental retardation" and that the federal government now mandates the use of "intellectual disability" in all federal enactments and regulations.  See Pub.L.No. 111-256, 124 Stat. 2643 (2010).

1    drug operation.  The government gave notice that it would seek the death penalty pursuant to

2    the Federal Death Penalty Act, 18 U.S.C. § 3591(a), and that it was authorized to do so by the

3    Attorney General.  (Docket No. 134.)

4           Jiménez-Benceví filed the pending motion on December 14, 2012, requesting that the

5    court make a pretrial determination that he is mentally retarded as defined by the Supreme

6    Court in Atkins v. Virginia, 536 U.S. 304 (2002).  (Docket No. 141.)  Such a finding would

7    preclude the imposition of a sentence of death pursuant to the Eighth Amendment to the U.S.

8    Constitution and 18 U.S.C. § 3596(c).  In an Order dated January 22, 2013, we scheduled a

9    pretrial hearing and issued orders to allow Jiménez-Benceví to develop the factual basis for his

10   claim of mental retardation.  (Docket Nos. 153, 181 and 198.)  On February 16, 17, and 18, we

11   held a hearing on the motion. The case is currently scheduled for trial, with jury selection to

12   begin on April 15, 2013.  (Docket No. 367.)

13   **B.      Expert and Lay Witness Testimony**

14          During the three days of hearings, Jiménez-Benceví called two expert witnesses. The

15   government called two expert witnesses and three lay witnesses. The qualifications of the expert

16   witnesses and the relationship of each lay witness to Jiménez-Benceví are summarized below.

17          **1.      Dr. Margarida**

18          Jiménez-Benceví's first expert witness was Dr. María Margarida Juliá, Psy.D.

19   Dr. Margarida is a licensed clinical psychologist.  She received a doctorate in clinical

20   psychology from the Massachusetts School of Professional Psychology and completed a post-

21   doctoral fellowship in neuropsychology at Harvard Medical School.  Additionally, she received

22   a Master's of Education from Harvard University in 1980.  Dr. Margarida serves as a full-time

23   professor at the University of Puerto Rico School of Medicine.  Dr. Margarida is a Fellow and

24   member of the American Psychiatric Association, and a member of the American

Criminal No. 12-221 (JAF)                                                          -3-

1    Neuropsychiatric Association. Her training is primarily in clinical psychology with a

2    specialization in neuropsychiatric disorders, brain dysfunction, and child development.

3    Dr. Margarida stated that she has performed Atkins assessments in eight prior federal capital

4    cases. (Docket No. 252 at 21.)  As we noted previously, Dr. Margarida does not specialize in

5    the study or evaluation of mental retardation.  See U.S. v. Candelario-Santana, 2013 WL

6    101615, at *7, 10, 19 (D.P.R. 2013).

7          **2.    Dr. Weinstein**

8          Jiménez-Benceví's second expert witness was Dr. Ricardo Weinstein, Ph.D.

9    Dr. Weinstein is a licensed clinical psychologist.  He received his Ph.D. in Clinical Psychology

10   from International College in Los Angeles, and received a post-doctoral certificate in

11   neuropsychology from the Fielding Institute in Santa Barbara, California.  Both institutions

12   were unaccredited and have ceased operations.  Dr. Weinstein is a member of the National

13   Academy of Neuropsychology.  Dr. Weinstein has limited clinical practice in the assessment

14   and diagnosis of mental retardation.  (Docket No. 253 at 181.)  His primary training in

15   intellectual disabilities comes from his service as an elementary school psychologist and as a

16   forensic expert.  (Id. at 159.)  He does, however, have wide experience in intellectual disability

17   assessments for Atkins determinations.[2]  Dr. Weinstein has conducted approximately forty

18   Atkins-related evaluations. (Id. at 180.)

_____

[2] As an expert witness in Atkins proceedings, Dr. Weinstein has a checkered history.  The Fifth Circuit Court
of Appeals was "troubled" with Dr. Weinstein's complete inability to explain his irregular methodology, including his
failure to "'report partial conclusions'" that contradicted the findings he submitted to the court.  Maldonado v. Thaler,
625 F.3d 229, 239 (5th Cir. 2010).  In Ortiz v. United States, the district court found Dr. Weinstein's expert testimony
"unreliable" and said that he "appears more concerned with legal culpability than with an objective assessment of
intellectual capability."  Ortiz v. United States, 2007 WL 7686126 at 2-7 (W.D.MO. Dec. 14, 2007).  In Pizzuto v.
Blades, the district court stated that Dr. Weinstein's findings, at best, were "ambiguous" and that it found it could not
"credit" his comprehensive IQ scores.  Pizzuto v. Blades, 2012 WL 73236 at 14 (D.Id. Jan. 10, 2012).

Criminal No. 12-221 (JAF)                                                                    -4-

1        **3.      Dr. Herrera-Pino**

2        Dr. Jorge Herrera-Pino ("Dr. Herrera") was the first expert to testify for the government.

3  Dr. Herrera has a Ph.D. in Educational and Clinical Neuropsychology from Wayne State

4  University, and is a Doctor of Medicine from Universidad de Alcalá, Spain.  He was a post-

5  doctoral fellow in pediatric and clinical neuropsychology at the Universidad de Alcalá, Spain.

6  Dr. Herrera is a member of the American Psychological Association.  Dr. Herrera has a long

7  and extensive clinical practice that has included a particular focus on the diagnostic evaluation

8  and assessment of mental retardation.  (Docket No. 347 at 8-9.)  In addition to his clinical work,

9  Dr. Herrera is the founder and director of the Miami Neurobehavioral Institute, where he

10  oversees a team of eleven licensed neuropsychologists.   Recently, he managed a five-year

11  contract from the State of Florida, in which he and his team were responsible for evaluating

12  5,000 individuals for developmental disability diagnoses.  A significant portion of Dr. Herrera's

13  career has also involved consultation and teaching with institutions throughout Spain and Latin

14  America.  He is an Associate Professor and a founding member of the college of medicine at

15  Florida International University.   His involvement in the field of neuropsychology stretches

16  some forty years.  He has also testified for both the government and defense as an expert in

17  Atkins hearings, including approximately ten times for the defense in habeas proceedings.

18        **4.      Dr. Grodzinski-Schwartz**

19        Dr. Jaime Grodzinski-Schwartz ("Dr. Grodzinski") was the second government expert to

20  testify. Dr. Grodzinski is a clinical psychologist.  Dr. Grodzinski received a doctorate and a

21  Master's of Science in psychology, with an emphasis in neuropsychology, from Carlos Albizu

22  University in Miami, Florida.  He has also received graduate degrees and licensures in clinical

23  psychology from institutions in Peru and Israel.  Prior to his coming to Puerto Rico,

24  Dr. Grodzinski held several clinical posts in Israel, including service as the Chief Clinical and

Criminal No. 12-221 (JAF)                                                                          -5-

1    Rehabilitation   Neuropsychologist   for   Tel   Hashomer   Hospital   in   Tel-Aviv,   Israel.

2    Dr. Grodzinski received training in intellectual disability assessments through his service in a

3    number of different positions, including as the Director of the Psychology Department at the

4    State Psychiatric Hospital in Río Piedras, Puerto Rico, and as a clinical psychologist in the

5    mental retardation program of the Puerto Rico Neuropsychiatric Unit. Presently, Dr. Grodzinski

6    serves as a neuropsychologist examiner for the Veterans Hospital, in San Juan, Puerto Rico.

7    Additionally,  he  performs  clinical  and  forensic  psychological  services  for  several  other

8    government entities.  Dr. Grodzinski is also an adjunct professor at Carlos Albizu University,

9    and maintains a private practice. Dr. Grodzinski has testified in several <u>Atkins</u> proceedings

10   previously and has conducted well over 6,000 assessments related to mental retardation and

11   intellectual disability.

12           **5.      <u>Sonia Mutt-Ortiz</u>**

13           The government's first lay witness was Sonia Mutt-Ortiz, an educator with over thirty-

14   six years of service in special education. (Docket No. 347 at 88.)  Mutt-Ortiz was Jiménez-

15   Benceví's special education teacher for a brief period of time during the semester just prior to

16   when  he  dropped  out  of  school.    (<u>Id</u>. at  90.)    Additionally,  Mutt-Ortiz  is  a  long-time

17   acquaintance of Jiménez-Benceví's family.  (Docket 248-4 at 12)  Mutt-Ortiz testified about her

18   professional  observations  of  Jiménez-Benceví's  behavioral  and  intellectual  limitations  in  a

19   formal, classroom setting. (<u>Id</u>.)

20           **6.      <u>Juan Ramón Ríos-Polo</u>**

21           The Government's second lay witness was Juan Ramón Ríos-Polo ("Ríos"). Ríos owns

22   an automotive repair shop and works as a pastor at a Protestant church in Caguas, Puerto Rico.

23   Ríos employed Jiménez-Benceví for a three-month span, from December 2011 to February

24   2012.  (Docket No. 305 at 48.)  During this time, Jiménez-Benceví rented a home owned by

Criminal No. 12-221 (JAF)                                                                                    -6-

1   Ríos' father.  (Id. at 64-5.)  Ríos testified about the mechanical work and employee supervision

2   he entrusted to Jiménez-Benceví.

3          **7.      Nasha N. Pazmino**

4          The Government's third lay witness was Nasha N. Pazmino. She is an adult female who

5   met Jiménez-Benceví through a mutual friend.  For a period of three weeks, Pazmino allowed

6   Jiménez-Benceví to visit and reside in her home with her children. (Docket No. 248-4 at 15.)

7   Pazmino testified regarding issues related to Jiménez-Benceví's general demeanor, social

8   behavior, hygiene, maturity, and daily routine.

9                                              **II.**
10
11                    **LEGAL STANDARD FOR MENTAL RETARDATION**
12
13         Jiménez-Benceví bears the burden of establishing mental retardation by a preponderance

14  of the evidence. See United States v. Smith, 790 F.Supp.2d 482, 484 (E.D.La. 2011) (allocating

15  burden of proof to defendant by preponderance of the evidence standard and resolving before

16  trial); United States v. Sablan, 461 F.Supp.2d 1239, 1242 (D.Colo. 2006) (establishing same

17  burden of proof and ruling that determination be made before trial).

18         Two provisions of law forbid federal courts from imposing a death sentence upon a

19  person who is mentally retarded. First, the Federal Death Penalty Act ("FDPA"), originally

20  enacted by Congress in 1988 and amended in 1994, provides that a "sentence of death shall not

21  be carried out upon a person who is mentally retarded."  18 U.S.C. § 3596(c).  Second, the

22  execution of mentally retarded individuals violates the Eighth Amendment's ban on "cruel and

23  unusual punishments."  Atkins, 536 U.S. at 321; see also U.S. Const. amend. VIII ("Excessive

24  bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments

25  inflicted.").

1        In <u>Atkins</u>, the Court held that a national consensus had developed against executing

2   persons with a "known IQ less than 70," a practice that had become "truly unusual." <u>Atkins</u> at

3   316.  The Court emphasized that the conception of mental retardation covered by this national

4   consensus included "mild" mental retardation, a clinical condition "typically used to describe

5   persons with an IQ between 50-55 and approximately 70." <u>Id.</u> at 308 n.3 (citing American

6   Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders: DSM-IV 42-43

7   (4th ed. 2000) (hereinafter DSM-IV)). According to the Court, mental retardation requires

8   "subaverage intellectual functioning…significant limitations in adaptive skills such as

9   communication, self-care, and self-direction that became manifest before age 18." <u>Id.</u> at 318.[3]

10                                                   **III.**

11
12                                              **<u>ANALYSIS</u>**

13
14   **A.      <u>Prong One: Significant Limitations in Intellectual Functioning</u>**

15        In <u>Atkins</u>, the Court observed that "an IQ score of between 70 and 75 or lower" is

16   "typically considered the cutoff IQ score for the intellectual function prong of the mental

17   retardation definition." <u>Id.</u> at 309 n.5 (citing 2 Kaplan & Sadock's Comprehensive Textbook of

18   Psychiatry 2952 (B. Sadock and V. Sadock eds. 7th ed. 2000)).  The five-point range referenced

19   by the Court reflects the fact that each comprehensive intelligence testing instrument has its

20   own standard error of measurement, or the measure of difference between an obtained score and

21   its theoretical true score counterpart. The standard error of measurement varies across test

22   instruments and age ranges.  (Docket No. 250-1 at 7.)  Because Jiménez-Benceví's IQ scores do

---

[3] It is important to note that while "the Supreme Court in <u>Atkins</u> could have adopted the clinical standard" for defining and evaluating mental retardation, "it explicitly declined to do so." <u>Hooks v. Workman,</u> 689 F.3d 1148, 1168 (10th Cir. 2012).  Though the clinical standards have informed our analysis, we emphasize that "a clinical standard is not a constitutional command." <u>Id.</u>  Therefore, in evaluating Jiménez-Benceví's claim, we have taken our primary guidance from the Supreme Court in <u>Atkins</u> and the expert testimony given at the hearing.

1   not fall below the threshold score of 70 according to any reliable expert evaluation, we hold that

2   he fails to satisfy the requirements of prong one.

3        **1.    Jiménez-Benceví's IQ Scores**

4        Jiménez-Benceví was administered an extensive assortment of tests measuring his

5   cognitive functioning—both by his own expert and by experts acting on behalf of the

6   government.  Altogether, we were given the results obtained from the administration of three

7   comprehensive intelligence tests: The Escala de Inteligencia de Wechsler para Adultos—

8   Tercera Edición (EIWA-III); the Woodcock-Muñoz Batería III (Batería III); and the Escala de

9   Inteligencia de Wechsler para Niños-Revisada-Puerto Rico (EIWN-R-PR), administered when

10  Jiménez-Benceví was age sixteen.

11       Dr. Margarida administered the EIWA-III.  She testified that the EIWA-III was the only

12  comprehensive intelligence test that she administered to Jiménez-Benceví.[4]  The EIWA–III is

13  recognized as a model tool for intelligence testing among Spanish-speakers.  See Nicholas S.

14  Thaler & Sharon Jones-Forrester, IQ Testing and the Hispanic Client in GUIDE TO

15  PSYCHOLOGICAL ASSESSMENT WITH HISPANICS, 88 (Lorraine T. Benuto, ed., 2012).  The

16  EIWA-III is a Spanish-language adaptation of the Wechsler Adult Intelligence Scale-Third

17  Edition (WAIS-III), and it includes the subtests and constructs that are the foundation of WAIS-

18  III testing.  Id. However, unlike the WAIS-III, the EIWA-III was adapted and standardized

19  specifically to Puerto Rico.  The third edition was developed in cooperation with the Ponce

---

[4] Nonetheless, on page 22 of her report is a table of results, including scores scaled for the WAIS III intelligence test.  (Docket No. 250-1.)  These two assessments are independent of one another.  Because she did not actually administer the WAIS-III (Docket No. 304 at 20.) to Jiménez-Benceví, we decline to consider the scaled WAIS-III scores included in Dr. Margarida's report.

1    School of Medicine in Puerto Rico to ensure the language and items were culturally appropriate

2    for Spanish-speaking Puerto Ricans.  <u>See</u> Brigida Hernandez, Elizabeth Horin & et alia,

3    <u>Psychological Testing and Multicultural Populations</u> in RACE, CULTURE, AND DISABILITY:

4    REHABILITATION SCIENCE AND PRACTICE (Fabricio E. Balcazar, Yolanda Suarez-Balcazar, et

5    alia eds., 2010).

6        The EIWA–III was the current version of the test at the time Dr. Margarida assessed

7    Jiménez-Benceví.  The test administered by Dr. Margarida consisted of a global scale and

8    several subscales or subtests, grouped into two general categories, "verbal" and "performance".

9    Dr. Margarida reported that Jiménez-Benceví obtained a Full Scale IQ of 57, with a Verbal IQ

10   of 57 and a Performance IQ of 69.  (Docket No. 250-1 at 22.)

11       In February of 2013, Dr. Weinstein administered the Batería III to Jiménez-Benceví.

12   The Batería III Pruebas de Habilidades Cognitivas–Extendida is the Spanish-language version

13   of the Woodcock–Johnson III Tests of Cognitive Abilities.  It is a comprehensive set of tests

14   that assesses both cognitive abilities and achievement levels of Spanish-speaking individuals.

15   (Docket No. 304 at 105.)  Dr. Weinstein reported that Jiménez-Benceví obtained a Full Scale IQ

16   of 74, with a Verbal IQ of 77 and a Performance IQ of 76.

17       In 2000, Jiménez-Benceví, then aged fifteen, was referred to Dr. Carmen Rullán, a

18   psychologist at Centro Educativo Joaquina de Vedruna, because "he was 'not retaining material

19   taught in class.'"  (Def. Exh. 6.)  As part of her assessment of Jiménez-Benceví, Dr. Rullán

20   administered the EIWN-R-PR.  Jiménez-Benceví obtained a Full Scale IQ of 79.  (Docket

21   No. 304 at 4.)  Dr. Rullán did not diagnose Jiménez-Benceví as mentally retarded.  (<u>Id.</u> at 5.)

22   This score stood without alteration or adjustment for twelve years.

1    However, during the course of their work as defense experts, Drs. Margarida and

2   Weinstein contacted Dr. Rullán on several occasions asking her to revisit her work.  (Id. at 4.)

3   According to Dr. Margarida, Dr. Rullán incorrectly scored one of the EIWN-R-PR subtests,

4   "Object Assembly." After reviewing her work alongside Dr. Margarida, Dr. Rullán agreed to

5   adjust the original score and subtract six points from Jiménez-Benceví's Performance Scale,

6   thus lowering his comprehensive IQ score.  (Id. at 7.)  Later, Dr. Weinstein contacted Dr.

7   Rullán and encouraged her to revisit the assessment once more and to consider further

8   downward adjustments to the score.  At Dr. Weinstein's urging, Dr. Rullán issued a declaration

9   stating that she may have also made errors in the tabulation of the "Picture Arrangement" test.

10   (Docket No. 250-4.)  According to Dr. Rullán, if these errors were appropriately considered,

11   Jiménez-Benceví's IQ score would be reduced another few points, falling to an overall score of

12   72.  (Id.)  However, in a supplemental report filed by Dr. Grodzinski, the government's expert

13   suggests that Dr. Rullán's errors include a failure to adequately credit certain answers that

14   would have warranted an upward revision from the original score of 79.  (Docket No. 248-3.)

15   According to Dr. Grodzinski, if Dr. Rullán had administered the EIWN-R-PR according to the

16   official test publisher's manual, Jiménez-Benceví would have been credited with a

17   comprehensive IQ score of 80, placing him "within a low average intelligence and not in a

18   Mental Retardation level." (Id. at 2.)

19    The only thing clear from Dr. Rullán's work, then, is that it is disputed.  We have no

20   doubt that clinicians make mistakes and the parties are free to argue about the significance of

21   those mistakes.  But what is troublesome here is that defense counsel's experts insisted on

1    contacting Dr. Rullán personally to produce changes to the old score, rather than simply arguing

2    in open court about the reliability of the old score.

3         This course of conduct may not be an outright violation of professional ethics but it

4    certainly strikes us as discordant.  Asking another professional to revisit work performed twelve

5    years earlier, merely to secure a result more convenient for the present purposes, is an

6    inadvisable practice: It raises the appearance of undue influence and it undermines the

7    credibility of the new conclusions, revised under pressure.  We will not countenance this sort of

8    mischief; we consider the whole constellation of revisions to Dr. Rullán's original score, but we

9    refuse to blindly credit these revisions, departures, corrections, or amendments—all of which

10   appear to be the product of badgering and persuasion, not an individual's honest assessment of

11   her own work and its potential flaws.  We assume, for the purposes of our analysis, that

12   Jiménez-Benceví's overall IQ score on the 2000 administration of the EIWN-R-PR was 76.

13        **2.    <u>Criticism of EIWA-III IQ Score by Dr. Herrera</u>**

14        In order to assess the credibility of the score Jiménez-Benceví obtained on the EIWA-III,

15   Dr. Margarida employed a variety of instruments designed to detect "suboptimal performance,"

16   or, malingering—the feigning or "exaggeration of symptoms for a secondary gain."  (Docket

17   No. 305 at 36.)  In her report, Dr. Margarida indicated that the results obtained from these

18   instruments clearly demonstrated that Jiménez-Benceví gave "adequate levels of cooperation

19   and effort" and that his scores on the EIWA-III were a "valid indication of [Jiménez-Benceví's]

20   present level of functioning."  (Docket No. 250-1 at 20.)

21        One of the instruments used by Dr. Margarida to determine if Jiménez-Benceví exhibited

22   any signs of malingering was the Rey 15 Item Test.  (Docket No. 250-1 at 20.)  Jiménez-

1    Benceví scored a three on one of the three elements of this test.  Dr. Herrera notes in his report

2    that a score of three is "substantially below the cutoff score of nine usually employed with this

3    task." (Docket No. 248-4 at 5.)  Dr. Margarida neglected to make note of this irregular score.

4          Moreover, Dr. Margarida could not account for the results from the other two elements

5    of the Rey 15 Item Test.  The only data we have from her administration of this test is the

6    element that Jiménez-Benceví obtained a score of three.  Dr. Margarida lost the scores from the

7    other two elements.   (Docket No. 304 at 30.)   We note that, inexplicably, the last time

8    Dr. Margarida came before this court she had also misplaced data sets from her administration

9    of assessments designed to detect malingering, including on the Rey 15 Item Test.  (Id.)

10         In her final report, Dr. Margarida recorded that Jiménez-Benceví obtained an overall

11   score of 20 on the Rey 15 Item Test.  The maximum score possible on this test, however, is 15.

12   When questioned about this scoring anomaly, Dr. Margarida indicated that it was an error on

13   her part.  (Id.)

14         Curiously, Jiménez-Benceví performed satisfactorily on the much more difficult Test of

15   Memory Malingering (TOMM). According to Dr. Herrera, that Jiménez-Benceví scored well on

16   a difficult assessment but performed substantially below expectations on a relatively easy

17   assessment is a clear indication of malingering.  (Docket No. 248-4 at 5.)

18         Dr. Margarida administered the Mini Mental Status Examination, or Folstein Test.

19   (Docket No. 250-1 at 19.)  The Mini Mental Status Examination is most commonly used as a

20   test to screen for cognitive impairment with patients suffering from dementia.  In his report,

21   Dr. Herrera notes that a baseline score on this instrument for patients with Alzheimer's type

22   dementia is 24.   (Docket No. 248-4 at 6.)   Dr. Margarida reported that Jiménez-Benceví

1    obtained a total score of 11.  Dr. Herrera notes that this score is "so poor that it is not even

2    consistent with the presence of *mild* mental retardation" (emphasis added) and stands as one

3    more marker of an "attempt at feigning or malingering cognitive dysfunction and intellectual

4    disability." (Id.)

5         Dr. Margarida also administered the Rey Word Recognition Test, another instrument

6    used by clinicians for the detection of suspect effort.  See Stephen Nich, Kyle Brauer Boone,

7    Johnny Wen, et alia, The Utility of the Rey Word Recognition Test in the Detection of Suspect

8    Effort, THE CLINICAL NEUROPSYCHOLOGIST 20; 873-887 (2006).  The instrument asks the test-

9    taker to identify fifteen words from a collection of thirty total words.  Jiménez-Benceví was

10   able to correctly identify nine out of the fifteen words presented to him by Dr. Margarida.  Dr.

11   Herrera states that the results obtained by Jiménez-Benceví on this test are entirely inconsistent

12   with Dr. Margarida's findings from the Mini Mental Status examination, where she indicated

13   Jiménez-Benceví was unable to repeat simple phrases or to read simple instructions out loud.

14   (Docket No. 248-4 at 7.)  Dr. Herrera noted that such reading capacities were inconsistent with

15   the low scores that he obtained on the Woodcock-Muñoz achievement test.  (Id.)

16        We suggest there are two possible explanations for these alarming inconsistencies:

17   (1) Dr. Margarida's scoring errors, inconsistent findings and haphazard custodianship of

18   Jiménez-Benceví's testing data can be blamed on professional incompetence; or, in the

19   alternative, (2) Dr. Margarida voluntarily misrepresented Jiménez-Benceví's appropriate effort

20   in an effort to lend undeserved credibility to the score he obtained on her administration of the

21   EIWA-III.  In any event, we will not hazard a guess at the explanation because the point

22   remains the same: There are too many inconsistencies and irregularities to credit Dr.

1    Margarida's finding that Jiménez-Benceví was not malingering. As such, we find the score she

2    reported from her administration of the EIWA-III to lack sufficient reliability and we decline to

3    consider it.

4        **3.      The "Flynn Effect"**

5        We find it important to clarify our prior refusal to entertain "Flynn Effect" adjustments

6    to any scoring administered by either the government or defense experts because the same

7    principle applies here.  See Candelario-Santana, 2013 WL 101615, at *14 (D.P.R. Jan. 8, 2013).

8    As we noted previously, the Flynn Effect is a phenomenon named for James R. Flynn, who

9    postulated that the population's mean IQ score rises over time, by about a third of a point each

10   year.  According to Flynn, if an individual's test score is measured against a mean of a

11   population sample from prior years, then that individual's score will be inflated to varying

12   degrees (depending on how long ago the sample was first employed) and will not provide an

13   accurate indication of his actual IQ. See, e.g., Walton v. Johnson, 440 F.3d 160, 177 n.22 (4th

14   Cir. 2006) (en banc) ("The premise of the 'Flynn Effect' is that IQ scores increase over time

15   and that IQ tests that are not renormed to take into account rising IQ levels will overstate a

16   testtaker's IQ score."); see also James. R. Flynn, Tethering the Elephant: Capital Cases, IQ, and

17   the Flynn Effect, 12 PSYCHOL. PUB. POL'Y & L. 170, 172 (2006) ("Naturally, judges want to

18   know whether defendants were actually two standard deviations below their peers at the time

19   they were tested and not how they rank against a group selected at some random date in the

20   past." (emphasis added)). See generally James R. Flynn, The Mean IQ of Americans: Massive

21   Gains 1932 to 1978, 95 PSYCHOL. BULL. 29 (1984). Flynn posited that a downward adjustment

1    to scores is necessary when a test lacking current norms is used. See Flynn, Tethering the

2    Elephant, supra, at 174–75.

3          However, the Flynn Effect remains highly controversial and many courts have declined

4    to accept its application.  See Thomas v. Allen, 607 F.3d 749, 757 (11th Cir. 2010) ("[T]he

5    Flynn Effect is a statistically-proven phenomenon, although no medical association recognizes

6    its validity.");  Maldonado v. Thaler, 625 F.3d 229 (5th Cir. 2010) ("Neither this court nor the

7    [Texas Criminal Court of Appeals] has recognized the Flynn Effect as scientifically valid.");

8    Williams v. Mitchell, 2012 WL 4505774, 34-36 (N.D. Ohio 2012) (holding that a state court's

9    failure to adjust an IQ score to take into account the Flynn Effect was not contrary to clearly

10   established federal law for purposes of 28 U.S.C. § 2254(d)(1); "[C]ourts have held that 'there

11   is no scientific consensus' on the validity of the Flynn Effect."); see also Jon Martin Sundet,

12   Dag G. Barlaug, Tore M. Torjussen, The End of the Flynn Effect? INTELLIGENCE 32; 349-362

13   (2004); Leigh D. Hagan, Eric Y. Drogin and Thomas J. Guilmette, IQ Scores Should Not Be

14   Adjusted for the Flynn Effect in Capital Punishment Cases, JOURNAL OF PSYCHOEDUCATIONAL

15   ASSESSMENT (2010); Alan S. Kaufman, In What Way Are Apples and Oranges Alike? A

16   Critique of Flynn's Interpretation of the Flynn Effect, JOURNAL OF PSYCHOEDUCATIONAL

17   ASSESSMENT (2010);  Michael Shayer and Denise Ginsburg, Thirty Years On—A Large Anti-

18   Flynn Effect?, BRITISH JOURNAL OF EDUCATIONAL PSYCHOLOGY (2009).

19         The government's experts testified that they were unaware of any professional consensus

20   about the use of the Flynn Effect.  (Docket No. 347 at 52.) Moreover, the government's experts

21   stated that, conceptually, the Flynn Effect was not intended to be applied every year after the

1    publication of an assessment, but was rather intended to offset changes that might occur in

2    scoring once an assessment was older than a generation.  (Id.)

3         As the government's experts clearly demonstrated, the EIWA-III test, recently revised in

4    2008, was not an old test in need of being "renormed" when it was administered to Jiménez-

5    Beneví.  Similarly, when the EIWN-R-PR was administered to Jiménez-Benceví in 2000, it was

6    not an old test, having been published in 1992.  (Docket No. 248-3 at 1.)  In other words, at the

7    time they were administered, none of the tests taken by Jiménez-Benceví were out-of-date or

8    reliant upon old norms and, therefore, any scores obtained by Jiménez-Benceví do not need

9    Flynn Effect adjustments.

10        Finally, in reviewing the prior work of the defense experts, we note an inconsistent

11   application of the Flynn Effect.  (Docket No. 304 at 22.)  To begin, when applying the Flynn

12   Effect both defense experts made sloppy calculation errors.  (Id. at 18-19.)  We note this only

13   because both defense experts spoke at length of the importance of the Flynn Effect.  Something

14   of such importance should not be so sloppily done.

15        Additionally, neither Dr. Margarida nor Dr. Weinstein, despite initially testifying to the

16   contrary, uses the Flynn effect in every case.  (Docket Nos. 304 at 13; 305 at 4-6.)  Rather,

17   Dr. Margarida admits that she uses the Flynn Effect in death penalty cases when "a single point

18   is the difference between life and death."  On cross-examination, it was pointed out to

19   Dr. Weinstein that in several recent cases he had not included Flynn Effect adjustments to the

20   scores he reported.[5]  It cannot be the case that the Flynn Effect is "best practices" (Docket

21   No. 304 at 13) or a standard feature of clinical procedure but that it is only selectively applied

22   when it produces results amenable to an individual clinician's task.

---

[5] We are not the first court to notice the discrepancy between Dr. Weinstein's testimony as an expert and his practice as a clinician.  See Martinez Ramirez v. Ryan, 2010 WL 3854792 at *14 (D.Az. Sept. 28, 2010).

1    The Flynn Effect remains controversial among scientific experts.  Courts of law are not

2    in the business of endorsing one side or the other in a scientific controversy.  Instead, we look to

3    ground our decisions on reliable sources. The Flynn Effect is sufficiently controversial as to be

4    unreliable. Under such circumstances, the Flynn Effect has no relevance to our inquiry and we

5    agree with the government's experts that it should not apply here.  See Hooks, 689 F.3d at 1170

6    (concluding that neither Atkins nor any other U.S. Supreme Court decision mandates the

7    application of the controversial Flynn Effect).

8        **4.    Conclusion**

9    We have considered the different professional determinations submitted by

10   Drs. Margarida, Weinstein, Rullán, Herrera, and Grodzinski, recognizing that each professional

11   assessment reflects both the art and the science of psychological evaluation.  Given all of the

12   testimony we have heard, we conclude that the best explanation of the data before us is that

13   Jiménez-Benceví does not exhibit sub-average intellectual functioning.

14   **B.    Prong Two: Limitations in Adaptive Functioning**

15   In the third footnote in Atkins, the Court described the key features of adaptive behavior

16   deficits, tracking language from the clinical guidelines published by the AAMR and the APA.

17   Atkins, Id. at 308 n.3.  According to the AAMR definition, a person meets prong two if he has

18   "related limitations in two or more of the following adaptive skill areas: communication, self-

19   care, home living, social skills, community use, self-direction, health and safety, functional

20   academics, leisure, and work."   Atkins, 536 U.S. at 308 n.3 (citing Mental Retardation:

21   Definition, Classification, and Systems of Supports 5 (9th ed. 1992)). The APA definition holds

22   that a person meets prong two if he has "significant limitations in adaptive functioning in at

23   least two of the following skill areas:  communication, self-care, home living,

24   social/interpersonal skills, use of community resources, self-direction, functional academic

1   skills, work, leisure, health, and safety." Id. (citing DSM-IV 41 (4th ed. 2000)).  As one

2   district court has observed, the two classifications "essentially measure the same skills."[6]

3   United States v. Davis, 611 F.Supp.2d 472, 490 (D.Md. 2009).

4         Because of the relative subjectivity of the adaptive behavior analysis, clinical judgment

5   is of significant importance.  When assessing adaptive behaviors, therefore, courts must make

6   their own independent determinations of the clinicians' judgment and credibility.[7] See Davis,

7   611 F.Supp.2d at 491 (noting importance of assessing information that goes to "the relative

8   credibility of the experts" in the case); Smith, 790 F. Supp. 2d at 505 ("the Court must rely on

9   its assessment of the relative competence and credibility of the individual experts").  After

10   considering both sets of expert reports, we find that Jiménez-Benceví has failed to show that he

11   has adaptive behavior limitations.

12   **1.**     **Dr. Margarida's Report**

13         Dr. Margarida provided a "Report" and "Addendum" describing her findings.  (Docket

14   Nos. 250-1, 250-2.) Dr. Margarida's report provides a specific "Adaptive Assessment"

15   beginning on page twenty-seven. (Docket No. 250-1 at 27.) There, Dr. Margarida discusses the

16   tools and methods she used to assess Jiménez-Benceví's adaptive behavior limitations.  (Id.)  In

17   addition to her clinical interviews with Jiménez-Benceví, Dr. Margarida met with the following

18   people: Ms. Mutt-Ortiz; Dr. Rullán, José Luis Morales, and Virgenmina Rivera, both employees

19   of Centro Educativo Joaquina de Vedruna; Roberto Nieves, Jiménez Benceví's former

20   employer; two of Jiménez Benceví's sisters, Brenda and Bianca, and his mother, Milagros; and

---

[6] The district court in Davis, 611 F.Supp.2d at 475 n.1, referred to the 2002 "AAMR Manual," as well as the supplemental AAMR "User's Guide," published in 2007 (citing AAMR, MENTAL RETARDATION: DEFINITION. CLASSIFICATION, AND SYSTEMS OF SUPPORT 8 (10th ed. 2002); MENTAL RETARDATION: DEFINITION, CLASSIFICATION AND SYSTEMS OF SUPPORT (2007)).  We see no great difference between the definitions of adaptive behaviors provided by the Court in Atkins and the later Manuals.

[7] This function has long been performed by district courts when weighing the testimony of dueling experts. Bruce v. Weekly World News, 310 F.3d 25 (1st Cir. 2002) ("Accordingly, the district court, qua factfinder, was entitled to make the crucial credibility determination as between the competing expert witnesses.").

1    Jiménez-Benceví's long-term girlfriend, Raquel Rosa Rivera, as well as Raquel's mother, Lydia

2    Rivera.    (Id. at 2-3.)  Of the various people she interviewed, Dr. Margarida asked Jiménez-

3    Benceví's sister, Brenda Jiménez, to complete the Vineland-II Adaptive Behavior Scales test

4    ("Vineland"). In addition to examining his available school records and standardized tests,

5    Dr. Margarida also considered developmental and etiological factors present in Jiménez-

6    Benceví's background.  (Id. at 30.)  Based on all of this information, Dr. Margarida concluded

7    that Jiménez-Benceví met the clinical definitions of mental retardation. (Id. at 27-31.)

8    However, we are unable to credit Dr. Margarida's assessment of Jiménez-Benceví's adaptive

9    behavior.

10        First, Dr. Margarida's method of administering the Vineland assessment was

11   fundamentally unreliable.   To begin, Dr. Margarida's report provides little justification to

12   support her contention that Brenda was a reliable person to serve as an interlocutor for this

13   assessment.  The memories Brenda had of Jiménez-Benceví were at least ten years old, raising

14   doubts about their reliability.  Moreover, like many of the people Dr. Margarida interviewed,

15   Brenda had a clear incentive to provide answers that were helpful to her brother, Jiménez-

16   Benceví.  Dr. Margarida did not choose to interview any of the people whose testimony was

17   most unhelpful to her conclusion, including, for example, Ríos-Polo or Pazmino.

18        In her report, Dr. Margarida repeatedly cites the work of Dr. John Gregory Olley, an

19   expert with the APA's Division 33 ad-hoc committee on mental retardation and the death

20   penalty. (Docket No. 250-1 at 6, n.3, 9n.11, 14.)  But, even under the terms prescribed by

21   Dr. Olley, Dr. Margarida has failed to follow standard best practices.  As Dr. Olley notes, "the

22   process of assessing adaptive behavior, particularly in a retroactive sense, 'is a matter of

23   drawing information from many sources, all of which are imperfect.'" Davis, 611 F.Supp.2d at

24   492 (quoting J. Gregory Olley, The Assessment of Adaptive Behavior in Adult Forensic Cases:

Criminal No. 12-221 (JAF)                                                                    -20-

1    Part 2, Psychology in Mental Retardation and Development Disabilities (American

2    Psychological Association/Division 33, Washington, D.C.) (Fall 2006)).   Faced with these

3    difficulties, courts have adhered to the "relative consensus that the best way to retroactively

4    assess defendant's adaptive functioning is to review the broadest set of data possible, and to

5    look for consistency and convergence over time."   Davis, 611 F.Supp.2d at 492 (reviewing

6    literature on best practices for assessing adaptive behavior).   In no sense did Dr. Margarida

7    consult the "broadest set of data possible."   Id.

8           Both of the government's experts testified that Dr. Margarida placed undue reliance on

9    her retrospective use of the Vineland to evaluate Jiménez-Benceví as he was at age seventeen.

10   In fact, Dr. Herrera wrote that he detected no "systematic attempt on her part to determine if the

11   defendant had current impairments or adaptive limitations."   We agree that this was a "crucial"

12   error.   (Id.)   For example, a photograph of Jiménez-Benceví from before his capture shows

13   Jiménez-Benceví sitting in a chair at a police station in Caguas.[8]   Jiménez-Benceví was in the

14   Caguas police station being interviewed by law enforcement.   (Docket No. 304 at 67-68.)   The

15   officers took a photo of him.   Prosecutors believe that he gave a false name and was allowed to

16   leave the station.   In the photo, Jiménez-Benceví is wearing a pressed, collared shirt and

17   designer glasses, with his hair slicked back.   His presentation is, as Pazmino would later testify,

18   meticulous.   An employee of the local law enforcement agency is sitting on the other side of the

19   table from him, with her hands resting on her cheeks.   Jiménez-Benceví is shown manipulating

20   a cellular phone.   At the very least, tracking the criteria from prong two, we think this photo

21   would have to be considered as some proof of the Defendant's self-care, interpersonal skills,

22   and self-direction.   (Docket No. 304 at 69-70.)   Dr. Margarida refused to consider this

23   photograph at any point in her analysis and, when examined, refused to acknowledge that the

_____

[8] This photograph was entered into evidence as Government's Exhibit 2.   The prosecutor and Dr. Margarida discuss the photograph at pages 68-71 of Docket No. 304.

1    photograph might illustrate Jiménez-Benceví's current adaptive strengths. (Docket No. 248-4 at

2    7.)

3         Second, Dr. Margarida failed to evaluate Jiménez-Benceví's present-day adaptive

4    behavior, as required to ground a finding of adaptive behavior deficits under prong two.

5    Dr. Margarida neglected to analyze several examples of Jiménez-Benceví's adaptive behavior

6    strengths.  (Docket No. 304 at 70-85.)  These include that Jiménez-Benceví: Evaded capture by

7    the police and survived as one of Puerto Rico's most wanted fugitives; used a Facebook

8    account, smart phone, and text messaging services; acquired and used false  identifications in

9    two separate jurisdictions; traveled to and from the island to the mainland; founded a business

10   enterprise in Miami; accessed and received funds at ATM machines and Western Union

11   stations; installed a plumbing mechanism to obtain an illegal water supply to Pazmino's house;

12   demonstrated relatively sophisticated carpentry and home improvement skills; worked as a car

13   mechanic. (Id.)

14        During cross-examination, Dr. Margarida was unwilling to acknowledge that any of

15   these behaviors might militate against a diagnosis of mental retardation.   (Id.)   Instead,

16   Dr. Margarida tried repeatedly to justify her decision to ignore such evidence—mostly by

17   stressing the notion that people who are mentally retarded with higher IQ scores "typically

18   demonstrate strengths in functioning alongside relative limitations"  (Docket No. 251 at 8) and

19   that a person with mental retardation could learn these skills given the proper environment and

20   supporting instruction.  (Id.)  Dr. Margarida was unable to point to evidence that Jiménez-

21   Benceví had received any support or instruction in the many areas in which he was proficient.

22   (Docket No. 304 at 70-85.)  For example, Dr. Margarida could not cite to any evidence that

23   anyone had taught Jiménez-Benceví carpentry skills or how to use the internet or process wire

24   transfers.  (Docket No. 304 at 78-83.)  But, Dr. Margarida admitted that she did not know

Criminal No. 12-221 (JAF)                                                                                    -22-

1   whether Defendant had prior experience in these areas.  We think that Dr. Margarida drew

2   exactly the opposite inference from the available evidence.  In the absence of any sign that

3   Defendant received training in these areas, the most appropriate explanation is that he learned

4   how to do them on his own.  Dr. Margarida's failure even to consider whether this may have

5   been the case undermines the credibility of her analysis.  We simply cannot agree that these

6   behavior strengths are not relevant to whether a person has adaptive behavior limitations.  Using

7   the criteria from Atkins, we think it clear that many of the activities the government mentioned

8   would have some bearing on a person's "communication, self-care, home living,

9   social/interpersonal skills, use of community resources, self-direction . . . work, leisure, health,

10  and safety." Atkins, 536 U.S. at 318 (citing DSM-IV 41 (4th ed. 2000))."

11        In fact, of this list of the DSM-IV criteria, Jiménez-Bencoví could show credible

12  evidence of really only one adaptive behavior limitation: Functional academic skills.

13  Dr. Margarida placed great emphasis on Jiménez-Bencoví's poor grades and the substandard

14  scores he received in his intelligence testing.  (Docket No. 250-1. at 29.)  But, as the

15  government ably demonstrated, those poor scores are just as easily explained by Jiménez-

16  Bencoví's troubled youth, oppositional attitude, poor attendance at school, and  general lack of

17  effort.  It is undisputed that Jiménez-Bencoví endured an extremely difficult childhood—made

18  worse by severe poverty, physical and emotional abuse, and poor educational support.  We find

19  these explanations, however, are far more persuasive for Jiménez-Bencoví's poor academic

20  functioning than any claim of mental retardation.

21        **2.      Dr. Weinstein's Report**

22        Dr. Weinstein provided a "Declaration" and a "Supplemental Declaration" that describe

23  his investigation and findings. (Docket Nos. 250-3, 250-6.)  In addition, Dr. Weinstein has

24  provided copies of two documents: An evaluation of Defendant done by Dr. Rullán of Centro

1   Educativo de Vedruna, and a declaration by Sonia Mutt-Ortiz, the special education teacher

2   who had Defendant in her class in 2000.   (Docket Nos. 250-4, 250-5.)   We have reviewed

3   Dr. Weinstein's report, his supporting documents, and his in-court testimony. We reject

4   Dr. Weinstein's conclusion that Jiménez-Benceví meets prong two of the mental retardation

5   definition under <u>Atkins</u>.

6          At the outset, we should note that we found Dr. Weinstein's testimony to be

7   substantially biased and dishonest.   His lack of professionalism is exemplified in his conduct

8   toward Mutt-Ortiz, a special education teacher who disagreed with his diagnosis. Dr. Weinstein

9   interviewed Mutt-Ortiz and mentioned his interview very briefly in his "Declaration." (Docket

10  No. 250-3 at 8.)  In his "Declaration," Dr. Weinstein explains that Mutt-Ortiz had very limited

11  contact with Jiménez-Benceví.  Dr. Weinstein then states that Mutt-Ortiz "wanted to make sure

12  that her comments presented in the right context and to that effect she provided a declaration

13  that is attached."  (<u>Id.</u>)  Attached to Dr. Weinstein's "Declaration" is a statement signed by

14  Mutt-Ortiz. (Docket No. 250-5.) The statement is written in a formal, legal construction.  (<u>Id.</u>)

15  It is obvious from reading the statement that it is not the type of declaration typically prepared

16  by a non-lawyer such as Mutt-Ortiz.  The relevant sections of points seven, nine, and ten read as

17  follows:

18              I cannot give an opinion regarding [Defendant's] intellectual
19              abilities or for learning within the academic realm . . . . I know
20              that a diagnosis of mental retardation can be done in conjunction
21              with a diagnosis of Attention Deficit Hyperactivity Disorder
22              (ADHD) and a diagnosis of Oppositional Defiant Disorder. . . . I
23              do not now have, nor did I have at the time during which I knew
24              Xavier, sufficient information to give an opinion regarding his
25              possible mental retardation diagnosis.  Only the persons who have
26              examined him with the necessary instruments for making that
27              determination can do so.

28

29  (Docket No. 250-5.)

1    The declaration concludes with the following statement: "I declare under oath that the

2    preceding is true and correct."  (Id.)  Ortiz' signature appears on the dotted line.[9] (Id.)  As we

3    later learned during Mutt-Ortiz' in-court testimony, this "declaration" was not reflective of what

4    she had told the defense experts.  In fact, Mutt-Ortiz took great umbrage at the suggestion that

5    she could not give an opinion regarding Jiménez-Benceví's mental retardation. (Docket No. 347

6    at 101.)  In response to that assertion, Mutt-Ortiz stated: "That goes against my having been a

7    teacher for 3[6] years. . . If I were not capable of giving an opinion, then I couldn't be a teacher,

8    because that's what we work with."  (Id.)   Mutt-Ortiz also testified that she told Dr. Weinstein

9    that she was certain that Jiménez-Benceví was not mentally retarded.  (Id. at 98.)  In Mutt-Ortiz'

10   words, Dr. Weinstein "wanted to make me believe that [Defendant] . . . was, in fact, mentally

11   retarded."  (Id. at 98.)  According to Mutt-Ortiz, her exchange with Dr. Weinstein went on for

12   about one and a half hours. Eventually, Dr. Weinstein left and told Mutt-Ortiz that he would

13   return the next day.

14        The next day, Dr. Weinstein arrived at her house, accompanied by a defense attorney,

15   Laura Maldonado, and two other people.  Mutt-Ortiz had the impression that they were in a

16   rush.  They told her that they had prepared a summary of their conversation from the day

17   before, and they asked her to sign.  Mutt-Ortiz says that she was not even given enough time to

18   read the entire declaration over before she was asked to sign it.  (Docket No. 347 at 99.)  The

19   whole process took approximately three minutes.  (Id.)  After skimming the first few points, and

20   noting that they seemed accurate, Mutt-Ortiz signed the form.  Only after the fact did Mutt-

_____

[9] In addition to the contradictions listed above, the declaration was signed "under oath" despite the fact that, in court, Ortiz refused to swear an oath, citing her religious beliefs.  (Docket No. 88.)

1    Ortiz notice that the "declaration" contained conclusions that directly contradicted what she

2    believed and what she had told Dr. Weinstein. (Id. at 99, 103.)

3          The contradictions between Mutt-Ortiz' version of events and Dr. Weinstein's are stark.

4    Yet, in his testimony, Dr. Weinstein maintained that the declaration was based on Mutt-Ortiz'

5    own words.  (Docket No. 253 at 184-186.)  This assertion seems to us blatantly false.  We found

6    Mutt-Ortiz to be a very credible individual.   Her demeanor on the stand was firm and

7    principled.  Her thirty-six years of teaching experience in Puerto Rico's schools, as well as her

8    deep familiarity with Jiménez-Benceví's family, lent additional weight to her testimony. We

9    have little difficulty concluding that her version of these events is more credible than

10   Dr. Weinstein's.

11         Dr.  Weinstein's  misrepresentation  of  Mutt-Ortiz'  professional  opinions  was

12   irresponsible.  The defense attorney who drafted the declaration also bears significant

13   responsibility for this blunder.  (Docket No. 347 at 118-120.)  As we stated in court, it is

14   completely unacceptable for an attorney to present this kind of statement to a witness and ask

15   her to sign "under oath."  This type of statement, if it is to be prepared at all, should be

16   characterized as an affidavit.  There was no legal basis for characterizing this statement as

17   "under oath." There was not even a notary present when Mutt-Ortiz signed this document.  (Id.)

18   That Mutt-Ortiz had religious objections to signing under oath; that she was not even given

19   enough time to read the statement; and that the statement was virtually the opposite of what she

20   believed, all make this error even more significant. In the future, counsel should abide by

21   professional and ethical norms and refrain from engaging in this type of behavior.

22         Considering this conduct, as well as Dr. Weinstein's improper contact with Dr. Rullán,

23   there were ample reasons to discredit Dr. Weinstein's analysis because of his apparent bias and

1  unprofessionalism.  But, even if we were to assume that Dr. Weinstein was acting in good faith,

2  we would disagree with many of the conclusions he drew from the available evidence.

3        First, almost every example that Dr. Weinstein gives of Jiménez-Benceví's adaptive

4  behavior strengths is followed by a qualification meant to lessen the positive significance of the

5  action.  The pattern in his report is the same one that Dr. Weinstein emphasized during his in-

6  court testimony.  (Docket No. 305 at 19-26.)  For example, in his "Declaration," Dr. Weinstein

7  notes that Jiménez-Benceví obtained a Florida driver's license that was based on false

8  identification.  (Docket No. 250-3 at 9.)  This seems significant in part because it demonstrates

9  a level of planning and executive function sophisticated enough to allow Jiménez-Benceví to

10  evade capture by law enforcement.  But Dr. Weinstein does not even consider whether this

11  might be a sign of positive adaptive behaviors. Instead, he writes: "[Pazmino] transported him

12  to the court house where the defendant obtained a Florida driver's license.  The process took

13  only a few minutes.  The defendant did not have to pass a written or driving test.  He did not

14  have to fill any forms he just signed a paper."  (Docket No. 250-3 at 9.)  Dr. Weinstein also

15  notes that Jiménez-Benceví opened an account and received money deposits at Bank of

16  America.  Jiménez-Benceví used online banking and received frequent wire transfers from his

17  business associates. Again, Dr. Weinstein minimizes these adaptive behaviors by emphasizing

18  that Pazmino drove him to the bank and to the ATM machines.  (Id.)  There were several more

19  examples of this type of adaptive behavior that Dr. Weinstein discounted.   On cross-

20  examination, the government also asked Dr. Weinstein about the fact that Defendant owned two

21  houses and received rental income from one of them.  Dr. Weinstein found this insignificant as

22  well, noting that the houses were "run down." (Docket No. 305 at 43-44.)  Instead of analyzing

23  each activity and considering what they might indicate about Jiménez-Benceví's adaptive

24  behaviors, Dr. Weinstein simply minimizes their significance with short declarative sentences.

1     Even Jiménez-Benceví's installation of an illegal plumbing mechanism, that provided

2    water to Pazmino's entire house, did not impress Dr. Weinstein.  Dr. Weinstein writes that this

3    task was simply a matter of cutting a hose, plugging it in, and gluing it.  (Id. at 10.)  According

4    to Dr. Weinstein, the installation of the mechanism—even the cutting of the hose—required no

5    tools.  (Id.)  Pazmino contradicted Dr. Weinstein's account. She described how Jiménez-

6    Benceví, on his own accord, planned and developed this mechanism to provide water to her

7    home.  Jiménez-Benceví found a hose of sufficient length that would stretch from the water

8    heater in Pazmino's house to an exterior faucet at her neighbor's house.  Using pliers and

9    scissors to make sure the hose fit, Jiménez-Benceví connected the hose from the neighbor's

10   home to Pazmino's water heater.  Pazmino noted that the Jiménez-Benceví measurements were

11   so precise that the mechanism escaped the notice of her neighbors in the gated community.

12   When Jiménez-Benceví was finished, Pazmino had running water in every room of her house,

13   which consisted of three bedrooms and two bathrooms.  Pazmino recalled that both her and her

14   friend, Joselin, were very impressed by Jiménez-Benceví's ingenuity, saying he was really

15   intelligent.

16     Second, we also learned—through the testimony of the lay witnesses—that many of the

17   characterizations Dr. Weinstein articulated in his written declaration and his testimony were

18   factually inaccurate or misleading.  Consider the "partial interview" that Dr. Weinstein

19   conducted with Pazmino.  Dr. Weinstein discusses his interview with Pazmino on pages nine

20   and ten of his "Declaration."  (Docket No. 250-3 at 9-10.)  The impression one has from reading

21   Dr. Weinstein's report is that Pazmino acted as a caretaker to Jiménez-Benceví, helping him to

22   complete his daily routine.  However, Pazmino specifically rejected Dr. Weinstein's assertions

23   that she had to provide substantial help to Jiménez-Benceví with his daily tasks, such as his

24   banking or ordering food.  Pazmino described Jiménez-Benceví as someone who was bright,

1   self-motivated, and enterprising, of firm convictions, and who successfully manipulated the

2   people around him to get what he wanted.  She described the level of control and assertiveness

3   that Jiménez-Benceví showed as impressive, noting that he would regularly call Puerto Rico

4   giving orders to send money to his account.  Contrary to Dr. Weinstein's descriptions, she

5   recalled that Jiménez-Benceví boasted of having many friends. She specifically recalled that

6   Jiménez-Benceví once showed her a YouTube video of him and his friends riding four

7   wheelers. His "compa," or group of friends, would call him by his nickname, "El Save."

8        Dr. Weinstein's pattern of minimizing Jiménez-Benceví's strengths while concealing or

9   distorting important context runs throughout the entire report. His interpretation of Jiménez-

10  Benceví's car purchase from "Witness X" is similarly unpersuasive.  (Docket No. 250-3 at 8.)

11  Dr. Weinstein describes a transaction in which Jiménez-Benceví paid Witness X monthly

12  payments for a car that was titled in Witness X's name.  Dr. Weinstein interprets the transaction

13  as one in which Jiménez-Benceví was exploited.  (Docket No. 305 at 11.)  Dr. Weinstein seems

14  to never have considered that this transaction was one more example of the way in which

15  Jiménez-Benceví improvised and developed a clever solution to overcome apparent obstacles.

16  Unable to buy a car in his own name because of poor credit, Jiménez-Benceví found a way to

17  acquire a car by way of informal purchase.  (Docket No. 305 at 12.)  Jiménez-Benceví's use of a

18  false identification in two jurisdictions, his steady income from illicit activities, his ability to

19  evade capture by the police—all of these suggest a person who had no problems with self-care,

20  money management, gullibility, or many other adaptive behaviors.  There is no suggestion that

21  Dr. Weinstein even considered an alternative interpretation other than his own.

22        These same flaws are apparent in Dr. Weinstein's treatment of Jiménez-Benceví's

23  employment under Ríos-Polo.  (Docket No. 305.)  As Jiménez-Benceví's employer for three

24  months at his mechanic shop in 2011-2012, Ríos-Polo had many opportunities to observe

1  Jiménez-Bencéví. Ríos-Polo provided numerous reasons for his belief that Jiménez-Bencéví

2  was not mentally retarded.  (Id. at 50-60.)  Ríos-Polo noted that Jiménez-Bencéví was punctual,

3  well-groomed, and "very intelligent."   (Id. at 57-60.)   Ríos-Polo also noted that Jiménez-

4  Bencéví was able to perform a wide variety of tasks in the mechanic shop, including fixing

5  brake pads, tiling the bathroom, and mixing and applying two-tone paint with sophisticated

6  machinery.  (Id. at 81.)  Ríos-Polo was particularly impressed with Jiménez-Bencéví's painting

7  abilities.  (Id.)  Because of the precise color and weight measurements required, correctly using

8  the shop's paint gun required a lot of skill and intelligence.  (Id.)  Somehow, Jiménez-Bencéví

9  always did a good job with this, despite never having been taught by Ríos-Polo.  (Id.)  Ríos-

10  Polo even treated Jiménez-Bencéví as something of an assistant-manager, trusting Jiménez-

11  Bencéví to give instructions to the other employees.  (Id.)   Again, rather than confront the

12  account given by Ríos-Polo, Dr. Weinstein barely mentions him.  (Docket No. 305 at 21.)

13  When pressed during cross-examination, Dr. Weinstein simply minimized the significance of

14  Ríos-Polo's testimony, arguing, without more, that Jiménez-Bencéví's employment under Ríos-

15  Polo was a form of gross exploitation.  (Id.)

16       Finally, Dr. Weinstein also makes many of the same errors of judgment as

17  Dr. Margarida.  Two of the adaptive behavior standardized tests that he used evaluated Jiménez-

18  Bencéví as he existed at age ten and age sixteen.  (Docket No. 250-6 at 1.)  While these may be

19  relevant to prong three, they are entitled to little weight under prong two, which requires a

20  present-day focus on a defendant's adaptive behaviors.

21       **3.      Dr. Herrera's Report**

22       Dr. Herrera prepared a report of his evaluation of Jiménez-Bencéví. (Docket No. 248-4.)

23  Dr. Herrera also provided a supplemental declaration clarifying an error in his report.  (Docket

24  No. 248-5.)  On February 18, Dr. Herrera testified in court.

Criminal No. 12-221 (JAF)                                                                -30-

1    Dr. Herrera performed a clinical interview of Jiménez-Benceví on January 14, 2013.

2    (Docket No. 248-4 at 1.)  One of the first things that Dr. Herrera noted was Jiménez-Benceví's

3    attempt to misrepresent important facts about himself.  (Docket No. 248-4 at 3.)  For example,

4    Jiménez-Benceví indicated to Dr. Herrera that he was largely anti-social and had few friends.

5    This was contradicted by Pazmino's account that Jiménez-Benceví hasd many friends, whom he

6    kept in contact with on a daily basis through social media and text messaging.  (Id.)  Perhaps

7    more importantly, Jiménez-Benceví misrepresented the level of sophistication of his job duties

8    while employed by Ríos-Polo as an auto mechanic.  Jiménez-Benceví told Dr. Herrera that he

9    largely did cleaning at the mechanic shop.  (Id. at 4.)  But Ríos-Polo's testimony indicated that

10   Jiménez-Benceví handled many kinds of sophisticated tasks with ease.

11   Dr. Herrera also conducted in-depth interviews with Mutt-Ortiz, Ríos-Polo, and Nasha

12   Pazmino.  (Docket No. 248-4 at 11-13.)  First, the lay witnesses that Dr. Herrera spoke with did

13   not have the same motivation to provide helpful answers to Jiménez-Benceví as many of the

14   witnesses chosen by Dr. Margarida.  We were also impressed by the objectivity and consistency

15   between Dr. Herrera's accounts of his interviews and the testimony these witnesses provided in

16   court—unlike Dr. Weinstein's report.

17   Dr. Herrera wrote that each of the three witnesses, when asked whether they considered

18   Jiménez-Benceví mentally retarded, answered emphatically and firmly "No."  Each had several

19   concrete examples of Jiménez-Benceví's intelligence.  Ms. Mutt-Ortiz opined that Jiménez-

20   Benceví "in no way had a diminished capacity," and at most had a learning disability.  (Docket

21   No. 248-4 at 12.)  She remembered Jiménez-Benceví as a leader among his peers, rather than a

22   follower.  (Id.) (Docket No. 347 at 94-102.)  Mutt-Ortiz recalled that when Jiménez-Benceví

23   would arrive to school, a group of children would go to meet with him in the field outside of the

24   classroom to congregate.  (Id.)   Jiménez-Benceví never had any problems doing his

1   mathematics or written assignments, which he could do "whenever he wanted to." Mutt-Ortiz

2   recalled that Jiménez-Benceví's only problems were his defiant attitude, poor attendance, and

3   general unwillingness to follow rules or obey authority. (Docket No. 347 at 94-102.)

4   Dr. Herrera appropriately took this analysis into account in his report.

5         Dr. Herrera also found that Jiménez-Benceví's work history provided further evidence of

6   Jiménez-Benceví's successful adaptive behaviors. Ríos-Polo saw Jiménez-Benceví as an

7   "intelligent and capable person." (Docket No. 248-4 at 14.) Ríos-Polo explained that Jiménez-

8   Benceví was a self-starter and that he never had to be instructed more than once. Even if

9   Jiménez-Benceví had not previously performed a task, Ríos-Polo felt confident asking Jiménez-

10  Benceví to do it. Ríos-Polo noted that Jiménez-Benceví was very resourceful and had above-

11  average problem-solving skills. During Ríos-Polo's testimony, we listened to countless

12  examples of Jiménez-Benceví's vocational abilities. (Docket No. 305 at 50-60, 80-82.) We

13  were impressed by the wide range of activities that Jiménez-Benceví mastered with minimal

14  instruction.

15        Ríos-Polo also noted that Jiménez-Benceví's hygiene and presentation were always very

16  neat and well-groomed. (Docket No. 248-4 at 14.) Ríos-Polo also noted that Jiménez-Benceví

17  was a guarded person, but he always acted in a respectful and appropriate manner. (Id.) From

18  Ríos-Polo's observations, Dr. Herrera discerned several of Jiménez-Benceví's strengths,

19  including his communication, self-care, social and interpersonal skills, use of community

20  resources, self-direction, work habits, health, and safety. See Atkins, 536 U.S. at 318 (citing

21  DSM-IV 41). Dr. Herrera summarized Ríos-Polo's description of Jiménez-Benceví as "totally

22  contrary to what could be expected" of a person with mental retardation. (Docket No. 248-4 at

23  15.)

1    Based on the data he collected from the lay witnesses, as well as the testing data set forth

2    in his report and in-court testimony, Dr. Herrera opined that Jiménez-Benceví did not suffer

3    from adaptive behavior limitations under prong two of the Atkins analysis.  We agree with his

4    conclusion that Jiménez-Benceví does not meet prong two of the mental retardation definition

5    provided in Atkins.

6    **4.    Dr. Grodzinski's Report**

7    Dr. Grodzinski submitted a report of his evaluation of Jiménez-Benceví.  (Docket

8    No. 248-1.)  He also provided two supplemental reports that analyze the work of Dr. Margarida

9    and a sworn statement provided by Jiménez-Benceví.   (Docket Nos. 248-2, 248-3.)   On

10   February 18, Dr. Grodzinski testified in court. As we did in the Candelario-Santana case, we

11   found Dr. Grodzinski to be a credible and professional clinician.

12   Dr. Grodzinski met with Jiménez-Benceví and performed a clinical interview.  (Docket

13   No. 248-1.)  During this interview, Dr. Grodzinski administered seventeen psychological tests.

14   Dr. Grodzinski also reviewed the available records and interviewed several witnesses who knew

15   Jiménez-Benceví.  (Id. at 9-11.)  These witnesses included Dr. Rullán; Ms. Mutt Ortiz; Witness

16   X, the person who sold the car to Jiménez-Benceví; two law enforcement officials who had

17   worked on cases involving Jiménez-Benceví; another percipient witness who was Jiménez-

18   Benceví's rival in the drug business; and two of Jiménez-Benceví's former employers,

19   including Ríos-Polo.   (Id.)   Based on all of this information, Dr. Grodzinski concluded that

20   Jiménez-Benceví did not suffer from significant adaptive behavior limitations.  (Id. at 12.)  We

21   agree with this conclusion.

22   Dr. Grodzinski opined that many of Jiménez-Benceví's behaviors—including his poor

23   academic performance—could be explained by Jiménez-Benceví's extremely traumatic

24   upbringing and history of "psychosocial deprivation."  (Id.)  In particular, Dr. Grodzinski noted

1    that Jiménez-Benceví had been physically and emotionally abused as a child.  (Id.)  According

2    to Dr. Grodzinski, this type of environment, combined with a record of educational failure,

3    could easily produce a number of behavioral disorders, including the defiant and oppositional

4    attitude manifested by Jiménez-Benceví.  (Id.)

5           Dr. Grodzinski's report emphasizes that Jiménez-Benceví consistently exhibited highly

6    adaptive behaviors to the people around him.  Dr. Grodzinski notes that Mutt-Ortiz recalled that

7    Jiménez-Benceví had a learning delay due to his poor attendance and behavior problems, but

8    never any intellectual impairment. Neither she nor anyone at Jiménez-Benceví's school ever

9    diagnosed Jiménez-Benceví as mentally retarded. Dr. Grodzinski notes Jiménez-Benceví's work

10   history was even more suggestive of adaptive behavior strengths.  Dr. Grodzinski indicates that

11   Ríos-Polo recalled that Jiménez-Benceví had no problems remembering things, was quick to

12   learn new skills, and was cautious and intelligent in dismantling and assembling heavy

13   machinery and complex mechanical parts.  Ríos-Polo also recalled that Jiménez-Benceví had

14   good conversation skills and was able to change his physical appearance depending upon the

15   situation. Dr. Grodzinski makes mention of another individual who had contracted with

16   Jiménez-Benceví for handyman services who believed that Jiménez-Benceví had a sophisticated

17   bearing. This individual also noted that Jiménez-Benceví was capable of replacing flooring,

18   plumbing, plastering, welding, and assembling a window.  After Jiménez-Benceví was arrested,

19   this individual realized that Jiménez-Benceví had given him false identification.

20         **5.    <u>Conclusion</u>**

21         On the basis of all the evidence presented, and using their expert clinical judgment, the

22   government's experts concluded that prong two was not a close call.  We agree with that

23   judgment. As the APA states, "[m]ental [r]etardation would not be diagnosed in an individual

24   with an IQ lower than 70 if there are no significant deficits or impairments in adaptive

1    functioning."  DSM-IV at 42. We have seen no credible evidence of any significant limitations

2    in Jiménez-Benceví's adaptive behavior that would suggest mental retardation.  Jiménez-

3    Benceví has simply failed to carry his burden of demonstrating, by a preponderance of the

4    evidence, that he suffers from significant limitations under this prong.  Therefore, the failure to

5    satisfy prong two alone would be sufficient to find Jiménez-Benceví not mentally retarded.

6    **C.    <u>Prong Three: Onset Before the Age of 18</u>**

7           In light of our above findings that Jiménez-Benceví is not mentally retarded presently,

8    any deeper analysis under this prong is unnecessary.  We note briefly that for the purposes of

9    prong three, there is very little credible evidence that Jiménez-Benceví showed signs of being

10   mentally retarded before the age of eighteen.  The only two non-family members who evaluated

11   Jiménez-Benceví before he was eighteen—Mutt-Ortiz and Dr. Rullán —both concluded that

12   Jiménez-Benceví was not mentally retarded at that time.   This characterization stood

13   unquestioned for twelve years, until the commencement of these proceedings.  We think that the

14   prior view of Dr. Rullán, and the current opinion of Mutt-Ortiz, is the correct one.  We reiterate

15   our belief that Jiménez-Benceví's poor academic skills are more easily explained by his poor

16   behavior, disturbed home environment, and spotty attendance at school than by mental

17   retardation.  In conclusion, we see no signs that Jiménez-Benceví was mentally retarded before

18   the age of eighteen.

19                                                **V.**

20
21                                          **<u>Conclusion</u>**

22
23          Following the three prong analysis—and informed by the reports and testimony given by

24   the experts and lay witnesses—we are convinced that Jiménez-Benceví does not meet the

25   definition of mental retardation under <u>Atkins</u>.  This case will proceed as a death-penalty eligible

26   prosecution.

Criminal No. 12-221 (JAF)                                                              -35-

1        Jiménez-Benceví's motion, (Docket No. 141), is hereby **DENIED**.

2        **IT IS SO ORDERED.**

3        San Juan, Puerto Rico, this 21st day of March, 2013.

4                                        s/José Antonio Fusté
5                                        JOSE ANTONIO FUSTE
6                                        United States District Judge