# United States Court of Appeals
## For the First Circuit

No. 13-2084

UNITED STATES OF AMERICA,

Appellee,

v.

XAVIER JIMÉNEZ-BENCEVI, a/k/a Xavi, a/k/a Benjie Rafael
Alicea-Colón, a/k/a José Andino, a/k/a Reinaldo Jiménez-
Bencevi, a/k/a Benjamín Amésquita-González,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Torruella, Thompson and Kayatta,
Circuit Judges.

John R. Martin, with whom Laura Maldonado-Rodríguez, were on
brief, for appellant.
Luke V. Cass, Assistant United States Attorney, with whom Rosa
Emilia Rodríguez-Vélez, United States Attorney, Nelson Pérez-Sosa,
Assistant United States Attorney, Chief, Appellate Division, and
John A. Mathews II, Assistant United States Attorney, were on
brief, for appellee.

June 3, 2015

**TORRUELLA,** <u>**Circuit Judge**</u>. Appellant Xavier Jiménez-Bencevi ("Jiménez") was convicted of tampering with a federal witness, possession of a firearm in furtherance of a crime of violence, use of a firearm during and in relation to crimes charged in the indictment, and use of a cell phone in attempting to commit kidnapping. Because the acts resulted in the death of the witness, Delia Sánchez-Sánchez ("Sánchez"), Jiménez faced the death penalty, though the jury ultimately rejected that punishment and instead recommended a sentence of life imprisonment without the possibility of release.

Jiménez now appeals, complaining that his trial was fatally flawed in three respects. First, he argues that the district court violated his immunity agreement with the government when it insisted that a defense expert be informed of a proffer made in an attempt to negotiate a plea. Second, he claims that the district court improperly restricted his right to cross-examine two cooperating witnesses by preventing Jiménez from inquiring into their exposure to a death-penalty-eligible offense. Finally, Jiménez contends that, with respect to the witness tampering charge, the evidence was insufficient to support his conviction because the government did not prove beyond a reasonable doubt that Jiménez murdered Sánchez to prevent her from providing evidence to federal authorities regarding a federal crime. Though we find no merit to Jiménez's second and third claims of error, we agree that

the district court improperly violated the immunity agreement. Accordingly, for the reasons that follow, we reverse.

## I.  **Background**

On June 21, 2010, Sánchez was shot and killed in broad daylight in front of the Colmado Hernández mini market in Bayamón, Puerto Rico.  The entire incident was captured on the market's security camera.  According to the footage, a car carrying Sánchez and two others -- later identified as Ronnie Pérez-Albino ("Pérez") and his mother Gloria Albino-Figueroa ("Albino") -- arrived at the Colmado Hernández at approximately 2:00 p.m.  Both Sánchez and Albino exited the vehicle, and almost immediately thereafter a white Honda Accord arrived.  Two men, neither of whom could be identified from the video, exited the Honda, grabbed Sánchez, and attempted to force her inside their car.  Sánchez resisted and screamed, and a struggle ensued.[1]  She eventually fell to the ground, at which point one of the men -- wearing jeans and a black shirt with a white design -- removed from his waistband a pistol which appeared to have been modified to fire automatically and shot Sánchez seven times.  With Sánchez still lying on the ground, the two men got back into the white Honda and drove away.

Following an investigation, authorities came to believe that the shooter was Jiménez, the owner of a drug point at the

---

[1]  While this struggle was occurring, Pérez pulled his mother back inside his vehicle.

Falín Torrech housing project in Sierra Bayamón and a fugitive who had posted bond and fled from a pending Puerto Rico murder charge. His brother Alexis Jiménez ("Alexis") was also Sánchez's boyfriend. Jiménez was indicted on March 23, 2012, and arrested three days later.    On January 10, 2013, the grand jury returned the present superseding indictment.    This four-count indictment charged: (1) tampering with a witness in violation of 18 U.S.C. § 1512(a)(1)(C) by killing Sánchez through the use of a firearm with the intent to prevent her from communicating to a federal law enforcement officer information related to the commission or the possible commission of a federal offense; (2) possession of a firearm modified to fire automatically in furtherance of the crimes charged in Counts One and Four of the indictment, in violation of 18 U.S.C. § 924(c)(1)(A)(iii) and (B)(ii); (3) using a firearm during and in relation to the crimes charged in Counts One and Four of the indictment, in violation of 18 U.S.C. § 924(j); and (4) using a cell phone in attempting to commit the kidnapping of Sánchez, in violation of 18 U.S.C. § 1201(a)(1).    The indictment also included a notice of special findings necessary for the government to seek the death penalty.

Approximately one month before the trial's April 15, 2013, start date, Jiménez approached the government regarding the possibility of entering a guilty plea in exchange for the removal of the death penalty.    In addition to agreeing to a sentence of

life without the possibility of release, the government required
Jiménez to provide a proffer containing both a detailed admission
of his guilt to all the crimes he was charged with and any known
information regarding other federal offenders.  The parties also
agreed that the proffer would be covered by direct use immunity.
The agreement provided that

> the United States agrees that no statements
> contained in the written proffer will be used
> against [Jiménez] directly in any criminal
> case in the District of Puerto Rico.  However,
> the United States may make derivative use of
> and may pursue any investigative leads
> suggested by any statements or information
> provided, including use in any criminal case
> against [Jiménez].  That is, the United States
> remains free to investigate any leads derived
> from information provided by [Jiménez], and to
> use any evidence gained as a result of such
> investigation in any subsequent prosecution of
> [him].  Further, should [Jiménez] subsequently
> testify in a manner inconsistent with any
> information provided in the written proffer,
> he may and will be cross-examined, confronted
> and impeached by these statements.

After reviewing Jiménez's proffer, the government ultimately
rejected his offer to plead guilty, and the case proceeded to
trial.

The trial's guilt phase lasted three days, and the
government presented over ten witnesses.[2]  Carmen Fernández-Ortega
("Tata"), a resident of the Falín Torrech housing project,
testified that both her husband and Jiménez's brother Alexis sold

---

[2]  Only the witnesses relevant to this appeal will be discussed.

crack cocaine and marijuana for Jiménez at the drug point.  She explained that she and Sánchez were friends and that Sánchez was vocal about her disapproval of her boyfriend Alexis's involvement in the drug operation.  Indeed, according to Tata, whenever Sánchez would arrive at the drug point, Jiménez would become upset and a confrontation would ensue.

Tata further testified that, as "a joke," she and Sánchez would record each other's conversations on their cell phones and that many of those conversations involved Jiménez.  She elaborated on one conversation in particular, where Sánchez stated that she would "turn him in to Justice."  Tata's husband overheard this recording and informed Jiménez.  Jiménez subsequently listened to the recording himself, became upset, hit Tata in the chest with the phone, and left, taking the phone with him.

Pérez and Albino also testified, explaining how and why they brought Sánchez to the Colmado Hernández mini market the day she was murdered.  Pérez testified that Jiménez had heard a cell phone recording of Sánchez in which she stated that she would hand him over to federal agents, and as a result Jiménez had asked Pérez to locate Sánchez for him because he wanted to stop her from talking to the authorities.  To accomplish this, Pérez enlisted the help of his mother, Albino.  According to Albino, Sánchez was her neighbor and the two had a friendly relationship which often involved Albino giving Sánchez a ride to the Colmado Hernández mini

market.  Pérez and Albino exploited this relationship and offered to drive Sánchez to the Colmado Hernández mini market on June 21, 2010, the day of the murder, so that Sánchez could withdraw money there.  Pérez explained that once Sánchez accepted their offer, he informed Jiménez that they would arrive around 2:00 p.m.

Both Pérez and Albino identified the shooter in the video as Jiménez.  Pérez stated that after the murder, Jiménez called him and told him that he "wanted to shoot her in the forehead, but that he had to bring the chip down."  Jiménez added that Pérez needed "to shut [his] mouth or the same thing would happen to [him]."  Albino corroborated this, testifying that "Xavier took out a pistol from his waist and shot [Sánchez]."  She added that Jiménez killed Sánchez "[b]ecause she was going to hand him over to the Feds."

In addition to these three witnesses, the government linked Jiménez to the crime through the following evidence: testimony of numerous police, forensic, and cooperating witnesses; the previously-described surveillance footage outside the Colmado Hernández mini market; phone records between Jiménez and Pérez; photographs of Jiménez found in a wallet in the white Honda Accord; and the combination of video footage at a Kentucky Fried Chicken showing a man with the same black shirt and white design as the shooter purchasing food, and a KFC food receipt (found in the Honda Accord) showing Jiménez contemporaneously purchasing food there. The government also provided the testimony of Luz Enid Aponte,

Sánchez's probation officer, who testified that on June 8, 2010, an FBI task force officer asked her not to visit Sánchez because Alexis had been stopped and questioned about whether Sánchez was providing information to the government.[3]  When Aponte and Sánchez met approximately one week later as part of Sánchez's probation requirements, Sánchez confirmed to Aponte that she was cooperating with the FBI, that Jiménez owned a drug point at Falín Torrech, and that he had threatened her.

Jiménez's defense strategy, meanwhile, was to create reasonable doubt by suggesting that the shooter in the video was not Jiménez but rather Raymond Jiménez ("Raymond"), Jiménez's brother and the twin brother of Alexis.  To accomplish this, Jiménez intended to employ a two-prong approach.  First, he worked to discredit Pérez and Albino through cross-examination aimed at establishing that they were either protecting or in fear of the real shooter.  Jiménez introduced telephone records between Pérez and two major drug offenders -- José Jiménez-Echevarría ("Lechón") and Harold Ayala-Vásquez ("Harry") -- throughout the day of Sánchez's murder, and Pérez admitted that he never told the agents

---

[3]  Sánchez was indeed providing information to the government. Officers inspecting Sánchez's body found a piece of paper containing telephone numbers belonging to federal agents.  One of those numbers belonged to FBI Task Force Investigative Agent Pablo Irizarry-Ayala ("Irizarry"), who testified that he had met with Sánchez and she had provided the FBI with information related to both Jiménez –- who she described as the leader of an organization in the Falín Torrech housing project in Bayamón -- and Alexis.

about these calls.  Moreover, Pérez conceded that he gave the agents several different versions of the events surrounding the shooting.  Jiménez also elicited testimony to the effect that Sánchez had bragged that she was going to take everybody down and that "everybody" included both Lechón, who was in a relationship with Albino, and Raymond.

Jiménez next aimed to demonstrate that Pérez and Albino were biased as a result of the plea and cooperation agreements they each had signed with the government.  According to the agreements, Pérez and Albino each agreed to plead guilty to tampering with a witness and to cooperate with the government against Jiménez, and, in exchange, the government would recommend a sentence of no more than seventy months.  When Jiménez's counsel asked Pérez if, "[w]hen you were arrested for your involvement in this case, a death eligible Indictment was filed against you?" the government objected, and a bench conference ensued.  During the sidebar, the government argued that Pérez was only charged with tampering with a witness, which was not a death-eligible offense.  Jiménez, meanwhile, argued that although Pérez and Albino were indicted on non-death-eligible offenses, the initial complaints filed against them were certified as potential death-penalty cases, and he had a right to probe whether the ultimate indictments not charging death-eligible offenses were the result of a covert agreement with the government.

The district court reviewed Pérez's indictment and rejected Jiménez's argument, concluding that "[t]his is not a death penalty eligible case, what he pled to."  It added that Pérez

> pled under 10-452 with tampering with a witness.  That's what he was charged with. Therefore, it was totally misleading to indicate to the jury or try to make the jury understand that at one point in time he was a death penalty eligible defendant.  He was never a death penalty eligible defendant. It's as simple as that.

The bench conference then ended, and Jiménez continued with his cross-examination, exploring other aspects of Pérez's plea and cooperation agreement, as well as other topics such as Pérez's involvement with drugs, his destruction of property, and violations while in federal prison.

Following the cross-examination, the parties revisited the death-penalty issue outside the presence of the jury.  During this exchange, the district court sought more information so it could determine whether Pérez's and Albino's indictments were indeed the result of an agreement with the government.  The government responded that there was no cooperation agreement in place at the time the indictment was filed and that the reason the government decided not to indict for a death-eligible offense was because it lacked any evidence that either Pérez or Albino knew that Jiménez planned to kill Sánchez at the Colmado Hernández mini market.  According to the government, it wanted to charge "what [it] could reasonably prove beyond a reasonable doubt for sure."

Still not entirely convinced, the district court proceeded to question both Pérez's and Albino's defense counsels. Both attorneys confirmed what the government had proffered, explaining to the district court that there was never a deal trading cooperation for a non-death-eligible "wishy washy" indictment. They also emphasized that even before the indictments were filed, both attorneys were adamant in communications with the government that neither Pérez nor Albino took Sánchez to the mini market knowing that she was going to be killed. Given all of this information, the district court upheld its initial ruling prohibiting Jiménez from questioning either Pérez or Albino about exposure to the death penalty. It emphasized, however, that except for the death-penalty inquiry, Jiménez could ask any question he wanted on the issue of the plea agreement. Though Jiménez did not ask Pérez anything further, he did question Albino about her plea and cooperation agreement and explored her potential bias due to her desire for a lower sentence.

The second prong of Jiménez's defense strategy focused on the surveillance video. As noted above, the video showed the shooter wearing jeans and a black shirt with a white design but did not capture his face. Jiménez intended to present the expert testimony of William J. Stokes, the former Chief of the Special Photographic Unit of the FBI Laboratory in Washington, D.C., who would have testified that the person in the surveillance video

could not have been Jiménez.   Specifically, Stokes would have
testified that after reviewing the surveillance footage and going
to the Colmado Hernández mini market to take measurements, he
concluded that the shooter in the video was at least 5'10½" --
several inches taller than Jiménez, who stood at 5'7".   Jiménez
would have also introduced evidence showing that his brother
Raymond was approximately 5'10".

        The government objected before trial to Stokes's
testimony, based on the proffer Jiménez had made in an attempt to
negotiate a plea.   According to the government, it was unethical
for Jiménez's counsel to present an expert stating that the shooter
was too tall to be Jiménez because the proffer agreement admitted
that Jiménez "was the shooter of Sánchez-Sánchez."   The district
court rejected this argument, but nevertheless opined that Jiménez
did have an obligation to inform Stokes of the information in the
proffer:

> I want you to be clear that I am not telling
> you on the record in case there is an appeal
> or something that I am foreclosing you [from
> calling Stokes].   What I am saying is that if
> there is a proffer, a proffer that clearly
> establishes a point, and that proffer comes to
> -- comes before me in the context of the
> pretrial practice of this case, as it
> happened, I cannot in good conscience allow an
> expert who has not been made aware of the
> proffer to give an expert opinion on something
> where he's missing evidence, he's missing
> facts, because I would then be in a sense part
> and parcel to the giving of evidence that is
> not realistic or true.

Jiménez objected, arguing that "[i]f that's the fact, then [Stokes] can be cross-examined about [the proffer], and then it comes in, so we're stuck."  The district court essentially agreed, stating that "[i]f it comes out good the way you do it, fine.  If it bounces in your face, it's a big problem that you have."

During trial the following day, Jiménez raised the issue again in an attempt to make a proffer to the court.  The district court reemphasized its prior point, explaining that "[w]hat you cannot do is hire an expert, once again, give him selective information for him to give you an opinion when you know that some of the facts that he has, that he doesn't have, make his opinion totally wrong.  You cannot do that."  The court effectively made clear that the expert could not offer his opinion as it stood to the jury.  If Jiménez called the expert to do so, the district court would voir dire him, revealing the substance of the proffer.  Then, reasoned the court, the expert would likely recant.  And even if he did not, the court would not allow Jiménez to "use an expert to give an imprimatur of expertise on something that [Jiménez] know[s] is totally false."  As a result, Jiménez never called Stokes to testify.

Jiménez was ultimately convicted on all four counts of the superseding indictment. Following the guilty verdict, the case proceeded to the sentencing phase to determine whether or not the death penalty would be imposed.    After five days, the jury

unanimously rejected the death penalty and recommended a sentence of life without the possibility of release.  The district court imposed this sentence on August 6, 2013, and this timely appeal followed.

## II.  **Discussion**

On appeal, Jiménez raises three issues.  First, he argues that the district court violated his immunity agreement with the government when it insisted that Stokes be informed of admissions made in Jiménez's proffer, despite the proffer being protected by direct-use immunity.  Second, Jiménez claims that the district court improperly restricted his cross-examination of Pérez and Albino by preventing him from inquiring into their initial exposure to a death-penalty-eligible offense as a bias and motivation for their cooperation and testimony.  Finally, Jiménez contends that, with respect to Count One's witness tampering charge, the evidence was insufficient to support his conviction because the government did not prove beyond a reasonable doubt that he murdered Sánchez to prevent her from providing evidence to federal authorities regarding a federal crime.  We address each in turn.

### A.  The Immunity Agreement

We first address Jiménez's argument that the district court violated his immunity agreement with the government -- made in a desperate attempt by Jiménez to negotiate a plea and avoid the death penalty -- when the district court required Jiménez to inform

Stokes, his photographic and video expert, of the proffer (and thus Jiménez's admissions) before the expert would be permitted to testify.  Before we reach the merits, however, we must address a potential procedural barrier raised by the government: that Jiménez waived this argument.

       1.  **Waiver**

       The government contends that because Jiménez never called Stokes to testify at trial, he waived any objection regarding Stokes's potential testimony.  In support, it cites to a host of cases -- from this Circuit and others -- that uniformly hold that a defendant cannot challenge conditional <u>in limine</u> rulings unless the witness actually testifies at trial and the conditional ruling is upheld.  <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Vázquez-Botet</u>, 532 F.3d 37, 50 n.7 (1st Cir. 2008); <u>United States</u> v. <u>Holmquist</u>, 36 F.3d 154, 164 (1st Cir. 1994); <u>see also</u> <u>Jones</u> v. <u>Kassulke</u>, No. 95-6459, 127 F.3d 1102, at *4 (6th Cir. Oct. 23, 1997) (unpublished table decision); <u>Bedoya</u> v. <u>Coughlin</u>, 91 F.3d 349, 352 (2d Cir. 1996); <u>United States</u> v. <u>Cree</u>, 778 F.2d 474, 479 (8th Cir. 1985).

       <u>Vázquez-Botet</u> and <u>Holmquist</u>, however, establish only the general proposition that when a district court has only conditionally ruled on evidence or testimony, and remains willing to consider it, a party must offer it if that party wishes to later complain about its exclusion.  Waiver simply does not apply to failures to revisit unconditional <u>in limine</u> rulings.  <u>See</u> <u>Crowe</u> v.

<u>Bolduc</u>, 334 F.3d 124, 133 (1st Cir. 2003); <u>Holmquist</u>, 36 F.3d at 166 n.12.

While the court strongly tipped its hand that it would insist that the expert be made aware of the proffer, and likely be exposed to cross-examination on the issue, we agree that, initially at least, some of those remarks in and of themselves were conditional.  However, throughout the exchange, the district court made its views increasingly definitive.  When Jiménez revisited the issue again at trial, he received reaffirmance of the district court's decision that the expert must be told of the proffer before the court would even consider allowing him to testify.  Along with this requirement came the district court's ultimate conclusion that the expert would likely recant upon learning of the proffer; and if he did not, the court would not allow him to testify.[4]  This ruling can only be characterized as unconditional, and thus <u>Vázquez-Botet</u> and <u>Holmquist</u> are inapplicable.    We therefore reject the

---

[4]  The district court stated that

> I offered you to have the witness sit here and be voir dired and be asked whether in light of that information, he would still be willing to give his testimony.  And I bet you that he would have said no, because once he gets to know the reality of the facts, no serious individual is going to take the stand and give the testimony of the kind that you want under these circumstances.

It then clarified that while Jiménez's counsel could argue "whatever [he] want[ed]," he could "not use an expert to give an imprimatur of expertise on something that [counsel] know[s] is totally false."

government's waiver argument and turn to the merits of Jiménez's objection.

### 2.  **The District Court's Actions**

"Informal immunity agreements, such as proffer agreements, 'are shaped . . . by the language of the contract conferring the immunity.'" United States v. Melvin, 730 F.3d 29, 37 (1st Cir. 2013) (alteration in original) (quoting United States v. Hogan, 862 F.2d 386, 388 (1st Cir. 1988)).  Accordingly, the meaning of the proffer agreement, and whether it was violated, are reviewed de novo.  Id.  In conducting this review, we are primarily guided by contract-law principles, including the familiar tenets that contracts should be construed to give effect to every word, clause, and phrase, and that when a term is ambiguous, it is to be construed against the drafter -- in this case the government.  Id. We say primarily guided, though, because the agreement is made in the course of a criminal proceeding.  To that end, "[p]roffer agreements are sui generis, and the contract-law principles that courts use in construing them are glossed with a concern that the defendant's consent to appear at a proffer session should not become a lever that can be used to uproot his right to fundamental fairness under the Due Process Clause."  Id. at 39; see also United States v. $87,118.00 in U.S. Currency, 95 F.3d 511, 517 (7th Cir. 1996) ("[S]uch agreements are unique contracts and the ordinary contract principles are supplemented with a concern that the

bargaining process not violate the defendant's rights to fundamental fairness under the Due Process Clause." (internal quotation marks omitted)). As a result, a violation of an immunity agreement is a due process violation. <u>Melvin</u>, 730 F.3d at 39.

Rule 410 of the Federal Rules of Evidence and Rule 11(f) of the Federal Rules of Criminal Procedure set the background rule: subject to certain non-applicable exceptions, "statements made in the course of plea negotiations . . . are inadmissible." This background rule, though, may be waived. <u>United States</u> v. <u>Mezzanatto</u>, 513 U.S. 196, 197, 210 (1995). Here, the parties agreed to a waiver that stated as follows:

> So long as [Jiménez] provides complete and truthful information in the written proffer, he shall have the protection afforded by direct use immunity; that is, the United States agrees that no statements contained in the written proffer will be used against him directly in any criminal case in the District of Puerto Rico. However, the United States may make derivative use of and may pursue any investigative leads suggested by any statements or information provided, including use in any criminal case against [Jiménez]. That is, the United States remains free to investigate any leads derived from information provided by [Jiménez], and to use any evidence gained as a result of such investigation in any subsequent prosecution of [Jiménez]. Further, should [Jiménez] subsequently testify in a manner inconsistent with any information provided in the written proffer, he may and will be cross-examined, confronted and impeached by these statements.

Nothing in this language even remotely granted the government the right to use the proffered admission in cross-examining Jiménez's

witnesses.  The omission is especially telling when this agreement
is compared to others used both in this Circuit and throughout the
country which grant the government permission to use the proffer to
rebut contrary evidence elicited from other defense witnesses.
Cf., e.g., Melvin, 730 F.3d at 36 ("No statements made or other
information provided . . . will be used by the United States
Attorney directly against him, except for purposes of cross-
examination and/or impeachment . . . ." (second alteration in
original)); United States v. Chiu, 109 F.3d 624, 626 (9th Cir.
1997) ("[T]he government may use . . . statements made by you or
your client at the meeting and all evidence obtained directly or
indirectly from those statements for the purpose of cross-
examination should your client testify, or to rebut any evidence,
argument or representation offered by or on behalf of your client
in connection with the trial . . . .").

      It is clear, therefore, that the government could not use
the proffer to cross-examine or otherwise impugn the expert.  As
the district court itself noted, the proffer language "does not
include the possibilit[y] of opening the door through the
presentation of evidence.  It has to be if the defendant
testifies."  Yet this is more or less what the district court
itself did, treating the proposed expert testimony as a
justification for the court's use of the proffer.  Indeed, it went
further, first using the proffer to find as a fact that Jiménez was

the shooter, and then announcing that the expert would either come
to that conclusion when shown the proffer, or not be allowed to
testify.  This is, in no uncertain terms, a violation of Jiménez's
right to due process of law.  See Melvin, 730 F.3d at 39.

The government makes a number of arguments in an attempt
to overcome this obvious violation.  We find none persuasive.
First, it suggests that the district court's order allowing the
proffer to be used against Jiménez was a derivative, not direct,
use of the proffer.  However, derivative means "[s]omething
derived; a thing flowing, proceeding, or originating from another."
United States v. Scott, 12 F. Supp. 3d 298, 304 (D. Mass. 2014)
(alteration in original) (quoting The New Shorter Oxford English
Dictionary 641 (1993)) (internal quotation marks omitted).  Here,
by contrast, the district court would not have used any information
derived or flowing from the proffer after subsequent investigation;
it would have used the proffer itself.  See Melvin, 730 F.3d at 38
(holding that an officer's voice identification of the defendant,
made after hearing the defendant during a proffer session, was a
direct use of the proffer); United States v. Pielago, 135 F.3d 703,
710 (11th Cir. 1998) (explaining direct use immunity to mean that
the government "may not use [the information or statements] as
evidence to obtain an indictment or guilty verdict").

In this manner, the district court itself treated the
proffer as irrefutably establishing a fact (that Jiménez was the

shooter) and then used that fact as a basis for precluding the expert from giving expert testimony that refuted it. As noted, the district court did not claim that the proffer allowed the government to use it to knock out Jiménez's expert witness. Rather, the court asserted its own independent authority as a "gatekeeper" of expert testimony under Rule 702, to use the proffer in this manner. In so proceeding, the district court clearly erred.

To begin, we see little advantage and much unfairness in allowing a district court to use a defendant's proffer against the defendant in a manner not allowed by the proffer. If a proffer allows only uses A and B, but the government can give the proffer to the court, which then uses it to do C at trial, proffers -- a valuable tool for both law enforcement and defendants facing severe sentences -- will be rendered unpredictable in their enforcement, and thus less likely to be made. The aim of an agreement not to use a proffer at trial against a non-testifying defendant is not to keep the government from using the evidence, it is to keep the judge and jury from using the evidence.

Second, the district court was simply wrong to treat the proffer as establishing a fact, much less the fact of guilt. There are many possible reasons why a defendant seeking to avoid the death penalty might conditionally admit to a false fact to see if

a sentence can be avoided.[5]  He might so fear death over a long sentence that a trade-off is seen as reasonable; he might be protecting another person; he might be of impaired capacity; or he might be deluded.  A proffer, much less an unaccepted proffer, is simply not the same thing as a guilty plea or conviction.  Yet, the district court treated it as such in order to eliminate an important defense witness.

A simplified example highlights the error here.  Imagine the defense found a high-resolution video of the shooting, clearly showing that the shooter was someone other than Jiménez, and Jiménez wanted to use an expert to authenticate the video.  Under the district court's reasoning, such a piece of evidence would have been automatically excluded as not "realistic or true" because it contradicted the statement in the proffer.  This makes no sense.[6]

---

[5]  In no way are we suggesting that a defendant's proffer and admission of guilt should be taken with a grain of salt.  In the run-of-the-mill case, it is in a defendant's best interest to tell the truth, and he or she often has little incentive to lie. However, as the Supreme Court has stated for over forty years, "death is different."  See, e.g., Ring v. Arizona, 536 U.S. 584, 605-06 (2002); Murray v. Carrier, 477 U.S. 478, 526 (1986) (Brennan, J., dissenting); Gregg v. Georgia, 428 U.S. 153, 188 (1976).  A defendant facing the death penalty has a strong incentive to say whatever is needed to eliminate a potential death sentence and preserve his life.  Indeed, when we asked learned counsel at oral argument whether he believes defendants sometimes admit guilt in a proffer in order to avoid a severe sentence even though they are not guilty, learned counsel unequivocally and succinctly stated, "Yes."

[6]  To the extent one tries to distinguish this example by arguing that the expert testimony here is less compelling, we note that such an argument would hinge on a judgment about the persuasiveness

Finally, the government argues that it was acceptable for the district court to require the proffer be disclosed because allowing Stokes to testify without knowledge of the proffer would have created an ethical violation since Jiménez's counsel would be allowing the presentation of false testimony.    We disagree. Attorneys practicing before the District Court for the District of Puerto Rico are bound by the American Bar Association's Model Rules of Professional Conduct.    D.P.R. R. 83E(a).    Rule 3.3(a) of these Rules requires a lawyer to "not knowingly . . . offer evidence that the lawyer knows to be false."    Model Rules of Prof'l Conduct R. 3.3(a)(3). The comment to this Rule elaborates that the prohibition "only applies if the lawyer knows that the evidence is false" and that a "lawyer's reasonable belief that evidence is false does not preclude its presentation to the trier of fact."    Id. cmt. 8.

Here, Jiménez's counsel had reason to be skeptical of the admission and thus did not "know" that Stokes's expert opinion was false.    First, when Jiménez was initially arrested, he denied involvement, instead stating that the shooter was his brother Raymond.    Second, as discussed above, the two eye-witnesses -- Pérez and Albino -- were not the most credible of witnesses: they provided the police with changing stories, they withheld information regarding who they were in contact with the day of

---

of that testimony -- a judgment which would go well beyond any gate-keeping role.

Sánchez's murder, they had relationships with two other likely suspects, and their testimony was part of a plea and cooperation agreement.  Third, Stokes -- a former FBI agent with over twenty-five years experience who was trained in examining photographic and video evidence -- opined that the shooter was too tall to be Jiménez.  Fourth, Jiménez was desperate to avoid the death penalty and the government was adamant that it would not consider any plea agreement unless Jiménez admitted to all of the charges.  Given all of this, Jiménez's counsel could reasonably conclude that Jiménez's admission might have been false and that he was simply stating whatever he had to in order to avoid the death penalty.

Moreover, there is nothing to suggest that Stokes believed his testimony was false.  This is no different than an alibi witness believing, though possibly mistakenly, that he or she saw a defendant at one location despite a defendant's proffer to the contrary.  Under the district court's and the government's rationale, the alibi witness would be unable to testify.  This is not what our justice system requires.[7]  See, e.g., Mich. Op. CI-

---

[7]  We also take issue with the district court's comment that it "ha[s] an obligation to make certain that the facts that come out are as truthful as possible to the reality of the case.  I cannot close my eyes to that reality.  It would be improper, wrong for me to do that, and I will not allow that."  District courts "close their eyes" to pertinent evidence all the time.  For example, that is the whole point of motions to suppress; if evidence or statements are suppressed, courts and parties pretend that the evidence does not exist.  Similarly, if evidence is excluded under Rule 403 of the Federal Rules of Evidence, pertinent and relevant evidence is ignored by the court and the parties because of a

1164 (Jan. 23, 1987) (finding no ethical violation in presenting an alibi witness who truthfully believes that the defendant was somewhere else at the time of the offense even though the client had revealed to counsel that he committed the crime).

The government points to two district court cases which contrarily hold that a defense attorney is ethically bound from presenting evidence which conflicts with statements made during his client's proffer, even if that proffer is subject to direct-use immunity. See United States v. Burnett, Criminal Action No. 08-201-03, 2009 WL 2180373, at *5 (E.D. Pa. July 17, 2009) ("Absent a good-faith basis, within the operation of the Pennsylvania Rules of Professional Conduct, [defendant's] counsel may not present evidence or arguments on [defendant's] behalf that directly contradict the admissions made by [defendant] during his proffer sessions."); United States v. Lauersen, No. 98CR1134 (WHP), 2000 WL 1693538, at *1 (S.D.N.Y. Nov. 13, 2000) ("This Court finds that [defendant's] waiver of rights is invalid to the extent that the Government seeks to use her statements for purposes other than to impeach [defendant] if she were to testify.  However, absent a good-faith basis, [defendant's] counsel may not present evidence or arguments on [defendant's] behalf that directly contradict specific

---

belief that it is unduly prejudicial.  This is no different. Jiménez's proffer, for all intents and purposes, did not exist unless he testified.  Just like excluded evidence, the district court had an obligation to "close [its] eye to that reality" unless Jiménez took the stand.

factual assertions summarized in the Form FD-302 prepared by the Government."). Both cases, however, carve out an exception for evidence presented with a "good-faith basis." Burnett, 2009 WL 2180373, at *5; Lauersen, 2000 WL 1693538, at *1. We believe that the situation presented here, for the reasons discussed above, would qualify as a "good-faith basis" for presenting Stokes's expert opinion even though it is contrary to the proffer. But to the extent that it would not, we simply note that these cases are not binding on us, and we believe them to be incorrect.

### 3. Harmless Error

Our conclusion that the breach of the immunity agreement violated Jiménez's due process rights does not end our discussion. Instead, we must still determine whether this ruling was harmless.[8] To that end, the government must show beyond any reasonable doubt that the jury's verdict would not have been influenced by the district court's error. See Melvin, 730 F.3d at 39 ("Because the government's adherence to the terms of the proffer agreement is

---

[8] As we noted in Melvin, "[i]t is open to legitimate question whether the rule demanding 'automatic reversal' based on 'policy interest[s]' might apply" to the violation of an immunity agreement. 730 F.3d at 38 n.3 (second alteration in original) (quoting Puckett v. United States, 556 U.S. 129, 141 & n.3 (2009)). The Second Circuit, for example, has ruled that it does. See United States v. Pelletier, 898 F.2d 297, 303 (2d Cir. 1990) ("The deliberate direct use at trial of all of a defendant's immunized grand jury testimony in violation of the government's express agreement to the contrary violates due process and cannot be considered harmless error." (internal citation omitted)). Like in Melvin, we decline to answer this question because the error was not harmless. See Melvin, 730 F.3d at 38 n.3.

insured by the Due Process Clause, its failure to adhere is
perforce of constitutional dimension.  It follows inexorably that
the stricter harmless-error standard [of harmless beyond a
reasonable doubt] applies to such a failure.").  This is something
it cannot do.

          As discussed above, the government's evidence consisted
primarily of the following: forensic data linking Jiménez to the
white Honda Accord involved in the shooting; video showing Jiménez
wearing clothing similar to that of the shooter; Tata's testimony
(1) that Sánchez and Jiménez did not get along due to Alexis's
involvement with Jiménez's drug trade and (2) that Jiménez heard a
recording where Sánchez said she was going to report Jiménez to the
Feds; and the testimony and eye-witness identifications by Pérez
and Albino.  With the exception of Pérez's and Albino's testimony,
much of this evidence was circumstantial.

          Of this evidence, by far the most damning was Pérez's and
Albino's testimony that, at Jiménez's request, they took Sánchez to
the Colmado Hernández mini market and then watched as Jiménez
exited the white Honda, tried to abduct Sánchez, and then murdered
her in broad daylight when the abduction failed.  This testimony,
however, was vigorously attacked on cross-examination.  Jiménez
highlighted that both Pérez and Albino were potentially biased and
provided multiple reasons for this bias, including strong personal
relationships with others who may have wanted Sánchez dead, fear

for their safety should they implicate the true shooter, and the cooperation agreements made with the government to ensure more lenient sentences.

Though the jury ultimately found Pérez and Albino credible enough to convict Jiménez, we cannot say beyond all reasonable doubt that the jury would have continued to credit this testimony and would have come to the same guilty verdict had Jiménez been able to provide expert testimony -- from the former Chief of the Special Photographic Unit of the FBI Laboratory, no less -- concluding that the shooter in the video was too tall to be Jiménez. The jury may very likely still have convicted Jiménez, but it may not have. Accordingly, the error was not harmless beyond a reasonable doubt, and we must reverse Jiménez's conviction.

## B.  Restrictions on Cross Examination

Though we are already reversing Jiménez's conviction, we will still address his Confrontation Clause argument because it has been fully briefed and will almost certainly arise again should Jiménez be retried. See Compagnie Nationale Air France v. Castano, 358 F.2d 203, 208 (1st Cir. 1966) ("Since there must be a new trial, and this matter is likely to come up again, we will deal with it."). According to Jiménez, the district court violated his Sixth Amendment right to confrontation by forbidding any cross-

examination about Pérez's or Albino's initial exposure to the death penalty.  We disagree.

The Sixth Amendment's Confrontation Clause "guarantees criminal defendants the right to cross-examine those who testify against them."  United States v. Vega Molina, 407 F.3d 511, 522 (1st Cir. 2005) (citing Davis v. Alaska, 415 U.S. 308, 315 (1974)).  It extends to cross-examination "reasonably necessary to delineate and present the defendant's theory of defense," id., and includes "the right to cross-examine the government's witness about his bias against the defendant and his motive for testifying," United States v. Ofray-Campos, 534 F.3d 1, 36 (1st Cir. 2008).  Indeed, we have consistently held that "cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested."  Brown v. Powell, 975 F.2d 1, 3 (1st Cir. 1992) (quoting Kentucky v. Stincer, 482 U.S. 730, 736 (1987)) (internal quotation marks omitted).

This right, however, has limits, and "[t]he Confrontation Clause does not give a defendant the right to cross-examine on every conceivable theory of bias."  United States v. Martínez-Vives, 475 F.3d 48, 53 (1st Cir. 2007) (alteration in original) (quoting United States v. Callipari, 368 F.3d 22, 38-39 (1st Cir. 2004), vacated on other grounds, 543 U.S. 1098 (2005))(internal quotation marks omitted).  As the Supreme Court explained in Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986),

> [i]t does not follow, of course, that the
> Confrontation Clause of the Sixth Amendment
> prevents a trial judge from imposing any
> limits on defense counsel's inquiry into the
> potential bias of a prosecution witness. On
> the contrary, trial judges retain wide
> latitude insofar as the Confrontation Clause
> is concerned to impose reasonable limits on
> such cross-examination based on concerns
> about, among other things, harassment,
> prejudice, confusion of the issues, the
> witness' safety, or interrogation that is
> repetitive or only marginally relevant.

To that end, our review of a district court's decision to limit cross-examination involves a two-step inquiry. First, we "review de novo the district court's conclusion that, even though cross-examination was limited, the defendant was afforded sufficient leeway to establish a reasonably complete picture of the witness' veracity, bias, and motivation." United States v. Capozzi, 486 F.3d 711, 723 (1st Cir. 2007) (quoting United States v. Byrne, 435 F.3d 16, 21 (1st Cir. 2006)) (internal quotation marks omitted). Then, assuming this initial threshold is satisfied, we "review the particular limitations only for abuse of discretion." Martínez-Vives, 475 F.3d at 53.

Here we have little doubt that Jiménez was able to paint for the jury a complete picture of both Pérez and Albino such that he "was afforded a reasonable opportunity to impeach" them. Id. (internal quotation marks omitted). Regarding Pérez, Jiménez introduced a number of facts calling both his identification of Jiménez and his credibility into question. First, Jiménez

-30-

established that beginning the morning of June 21, 2010, and
continuing until after Sánchez's murder that afternoon, Pérez had
multiple conversations with Lechón and Harry -- both of whom were
involved in drug dealing in Falín Torrech and both of whom were
included in Sánchez's threat to take everybody down -- yet failed
to reveal this information to the authorities.  Second, Jiménez
elicited the fact that Pérez provided the authorities with
inconsistent versions of his story.  As to Albino, Jiménez showed
a motive for implicating him and protecting Lechón, who he alleged
was potentially the true shooter: Albino was in a relationship with
Lechón.

        Moreover, though the district court forbade any
questioning about death-penalty exposure, it never prohibited
Jiménez from discussing the plea and cooperation agreement itself.
To the contrary, Jiménez cross-examined both Pérez and Albino about
the details of the agreement and their understanding that they
would receive a more-lenient sentence if they cooperated.  That
Jiménez could not emphasize just how severe Pérez's and Albino's
possible sentences could have been had they not cooperated did
nothing to detract from his central argument: both Pérez and Albino
were biased and motivated to provide incriminating testimony
against Jiménez in an attempt to look out for their own best
interests and receive a lighter sentence.  We have previously
upheld a district court's decision to prohibit cross-examination

into a cooperating witness's exposure to the death penalty so long as the defendant could still probe into other aspects of the plea agreement, and we see no reason to deviate from that position here. See Capozzi, 486 F.3d at 724 ("[T]he district court did not commit constitutional error when it declined to allow [defendant] to inquire into the subject of [the cooperating witness's] avoidance of the potential death penalty attached to this uncharged crime which [the witness] had supposedly avoided by cooperating with the government" because defendant "had considerable ammunition . . . from which to demonstrate that [the witness] had a powerful motive to testify in a manner supportive of the government.").

        Reviewing the cross-examinations as a whole, we conclude that Jiménez provided a "reasonably complete picture of the witness[es]' veracity, bias, and motivation" despite the district court's limitation, and therefore the limitation did not violate the Confrontation Clause. See id. at 723; Brown, 975 F.2d at 5 (finding no violation of the Confrontation Clause where the district court prevented the jury from hearing the potential penalty of life imprisonment that a cooperating witness avoided by pleading guilty because the jury "was clearly given sufficient information from which it could conclude that the [accomplice] had a substantial motivation to testify against petitioner," such as the specifics of the accomplice's plea agreement, the witness's criminal record, that the witness had given the police a different

statement than his testimony, that the witness had stolen the murder weapon, and that the witness had reviewed the investigative file before testifying); United States v. Twomey, 806 F.2d 1136, 1139-40 (1st Cir. 1986) (restricting cross-examination into an unsubstantiated charge that the witness was involved in two murders in part because "the circumstances from which the jury could decide whether [the witness] might have been inclined to testify falsely in favor of the government was adequately presented"); cf. Vega Molina, 407 F.3d at 523-24 (finding a Sixth Amendment violation where the district court precluded any cross-examination into a cooperating witnesses's motive for enlisting in the robbery scheme).

Having found that Jiménez's opportunity to impeach Pérez and Albino satisfied this initial threshold, we turn to whether the district court nevertheless abused its discretion in precluding this line of questioning.  "An abuse of discretion has occurred only if the jury is left without 'sufficient information concerning formative events to make a discriminating appraisal of a witness's motives and bias.'"  Twomey, 806 F.2d at 1140 (quoting Harris v. United States, 367 F.2d 633, 636 (1st Cir. 1966)) (internal quotation marks omitted); see also Ofray-Campos, 534 F.3d at 37 ("'To establish that the district court has abused its discretion, the defendant must show that the limitations imposed were clearly prejudicial.'" (quoting United States v. Williams, 985 F.2d 634,

639 (1st Cir. 1993))).  In other words, the restrictions must be "manifestly unreasonable or overbroad."  Ofray-Campos, 534 F.3d at 36 (citation and internal quotation marks omitted).

Here, the district court's limitation was neither unreasonable nor overbroad.  We have already explained how Jiménez questioned Pérez and Albino about the details of their plea and cooperation agreements and about their other potential biases and motivations for testifying.  Moreover, as the district court correctly noted, while a complaint alleging a death-eligible offense was initially filed, Pérez and Albino were never indicted on this charge and consequently were never actually exposed to the death penalty.  Still, when Jiménez argued that this was precisely because of an agreement, the district court inquired further and questioned the government and both witnesses' attorneys.  Each party provided the same information: the non-death-eligible indictment was not a result of an agreement among the parties but rather due to the lack of evidence that either Pérez or Albino knew Sánchez would be killed at the Colmado Hernández mini market.  The district court accepted this explanation and, as a result, believed that raising the issue with the jury would be misleading and confusing.

Given the district court's "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits" on cross-examination, Van Arsdall, 475 U.S. at 679, this conclusion

was not "manifestly unreasonable." Nor did it prejudice Jiménez. See Ofray-Campos, 534 F.3d at 37. Accordingly, we find no abuse of discretion by the district court in prohibiting Jiménez from inquiring into the witnesses' potential exposure to the death penalty. See Capozzi, 486 F.3d at 724 ("Nor did the court's decision to bar the questioning constitute an abuse of its general discretion. . . . Any risk that [the witness] would have been charged with the death penalty offense was at best . . . wholly speculative."); United States v. Álvarez, 987 F.2d 77, 82 (1st Cir. 1993) (finding no abuse of discretion where the district court prevented the jury from learning of the exact penalties the witness would face if found guilty); Twomey, 806 F.2d at 1139-40 (finding no abuse of discretion where the district court restricted cross-examination into a witness's supposed involvement in two murders to establish bias in part because "[t]here is no evidence to support such a charge, and, in fact, [the witness's] plea agreement explicitly states that it does not protect him from prosecution for crimes of violence").

## C. Sufficiency of the Evidence for Count One

Finally, we must still address Jiménez's sufficiency argument for double jeopardy purposes. See Marshall v. Bristol Superior Court, 753 F.3d 10, 18 (1st Cir. 2014) ("It is black letter law that 'the Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally

insufficient.'" (quoting <u>Burks</u> v. <u>United States</u>, 437 U.S. 1, 18

(1978))). According to Jiménez, there was insufficient evidence to

support his conviction on Count One, the witness tampering charge,

and thus his Rule 29 motion for judgment of acquittal of Count One

should have been granted. We review this allegation <u>de novo</u>.

<u>United States</u> v. <u>Pérez-Meléndez</u>, 599 F.3d 31, 40 (1st Cir. 2010).

In doing so,

> we examine the evidence, both direct and
> circumstantial, in the light most favorable to
> the jury's verdict. We do not assess the
> credibility of a witness, as that is a role
> reserved for the jury. Nor need we be
> convinced that the government succeeded in
> eliminating every possible theory consistent
> with the defendant's innocence. Rather, we
> must decide whether that evidence, including
> all plausible inferences drawn therefrom,
> would allow a rational factfinder to conclude
> beyond a reasonable doubt that the defendant
> committed the charged crime.

<u>Id.</u> (quoting <u>United States</u> v. <u>Troy</u>, 583 F.3d 20, 24 (1st Cir.

2009)) (internal quotation marks and emphasis omitted); <u>see also</u>

<u>United States</u> v. <u>Sepúlveda</u>, 15 F.3d 1161, 1173 (1st Cir. 1993).

This is a "formidable" standard of review, so "defendants

challenging convictions for insufficiency of the evidence face an

uphill battle on appeal." <u>Pérez-Meléndez</u>, 599 F.3d at 40 (quoting

<u>United States</u> v. <u>Lipscomb</u>, 539 F.3d 32, 40 (1st Cir. 2008))

(internal quotation marks omitted).

　　　　In order to establish a violation of 18 U.S.C.

§ 1512(a)(1)(C), the government must prove beyond a reasonable

doubt that there was "(1) a killing or attempted killing, (2) committed with a particular intent, namely an intent (a) to 'prevent' a 'communication' (b) about 'the commission or possible commission of a Federal offense' (c) to a federal 'law enforcement officer or judge.'" <u>Fowler</u> v. <u>United States</u>, 131 S. Ct. 2045, 2049 (2011) (quoting 18 U.S.C. § 1512(a)(1)(C)). Here, Jiménez concedes that the government satisfied its burden for most of these elements and only challenges the proof for the element that Sánchez was killed in order to prevent her from providing information concerning "the commission or the possible commission of a Federal offense." According to Jiménez, the evidence showed that if he killed Sánchez, it was done to prevent her from communicating his whereabouts to federal officials so that he could be arrested on the outstanding Puerto Rico murder charge for which he was a fugitive. In support of this contention, Jiménez points to the investigative notes which reported that Sánchez was "willing to provide [Jiménez's] location to the feds to have him arrested on an outstanding state warrant."

While we agree that a jury <u>could</u> have come to this conclusion, we "need not conclude that <u>only</u> a guilty verdict appropriately could be reached" in order to sustain the conviction. <u>Sepúlveda</u>, 15 F.3d at 1173 (emphasis added). To the contrary, "it is enough that the finding of guilt draws its essence from a plausible reading of the record." <u>Id.</u>; <u>see also</u> <u>Pérez-Meléndez</u>,

599 F.3d at 40 ("Nor need we be convinced that the government succeeded in eliminating every possible theory consistent with the defendant's innocence." (quoting Troy, 583 F.3d at 24) (internal quotation marks omitted)).  And a review of the record satisfies us that the government has met its burden.

At trial, Tata testified that Sánchez was unhappy that Alexis -- her boyfriend and Jiménez's brother -- was involved in Jiménez's drug operation.  As a result, she and Jiménez did not get along, and whenever she would arrive at the drug point, Jiménez would become upset and a confrontation would ensue.  Tata further testified that she recorded Sánchez saying that Sánchez would "turn [Jiménez] in to Justice."  Given that their rocky relationship stemmed from Jiménez's drug activities and not his status as a fugitive, the jury could have plausibly inferred that Jiménez understood Sánchez to be referring to his drug trafficking activities, which is clearly a federal offense.  See, e.g., 21 U.S.C. §§ 841(a)(1) and 846 (criminalizing possession of controlled substances with the intent to distribute and conspiracy to possess controlled substances with the intent to distribute, respectively).

The government presented additional circumstantial evidence supporting this inference.  First, Aponte testified that on June 8, 2010, an FBI task force officer had asked her not to visit Sánchez because Alexis had been stopped and questioned about whether Sánchez was providing information to the government.

-38-

Aponte added that Sánchez later confirmed that she was cooperating
with the FBI, that Jiménez owned a drug point at Falín Torrech, and
that he had threatened her.  Officer Irizarry similarly testified
that Sánchez had provided him with information regarding Jiménez's
drug operations.[9]  Pérez, meanwhile, testified that Sánchez had
bragged that she was going to take everybody down.  It is plausible
to infer that both Alexis and Pérez would have reported these
incidents to Jiménez, and that Jiménez would have interpreted both
the questioning of Alexis and the use of "everybody" to refer to
the drug activity to which multiple people were involved, and not
to Jiménez's status as a fugitive.

        Taking all of this evidence together and making plausible
inferences in the light most favorable to the jury's verdict, we
believe a rational factfinder could have concluded beyond a
reasonable doubt that Jiménez intended to prevent Sánchez from
providing information to federal authorities regarding Jiménez's

---

[9]    In his recitation of the facts, Jiménez suggests that the
government violated both 18 U.S.C. § 3432 and Rule 26.2 of the
Federal Rules of Criminal Procedure when it called Officer Irizarry
to testify in support of this element.  Jiménez provides no legal
arguments or citations to support this claim, however, so it is
therefore waived.  See United States v. Zannino, 895 F.2d 1, 17
(1st Cir. 1990) ("[It is a] settled appellate rule that issues
adverted to in a perfunctory manner, unaccompanied by some effort
at developed argumentation, are deemed waived.  It is not enough
merely to mention a possible argument in the most skeletal way,
leaving the court to do counsel's work, create the ossature for the
argument, and put flesh on its bones." (internal citations
omitted)).

narcotics operation -- a federal offense.  Accordingly, his Rule 29 motion was properly denied.

### III. Conclusion

To summarize, the district court's order requiring Jiménez's expert witness, Stokes, to be informed of admissions made by Jiménez in his proffer statement contravened the immunity agreement, and thus violated Jiménez's due process rights.  This error was not harmless beyond a reasonable doubt, and therefore Jiménez's conviction cannot stand.  Should Jiménez be retried, it will be well within the district court's discretion to limit the cross-examinations of Pérez and Albino to prohibit any references to their potential exposure to the death penalty, so long as Jiménez is given the same sufficient leeway to establish a reasonably complete picture of both Pérez's and Albino's veracity as he was during this trial.  Finally, even though the conviction is reversed due to the violation of the immunity agreement, we conclude for double jeopardy purposes that there was sufficient evidence for the jury to have found that Jiménez killed Sánchez in order to prevent her from providing information to federal authorities concerning "the commission or the possible commission of a Federal offense," and thus his Rule 29 motion for judgment of acquittal as to Count One -- the witness tampering charge -- was properly denied.

**REVERSED**.